## In re GLADDING CORPORATION, Debtor.

### Bankruptcy No. 77–00728–G.

United States Bankruptcy Court, D. Massachusetts.

Aug. 19, 1982.

Christopher C. Mansfield, Liberty Mut. Ins. Co., Boston, Mass., for plaintiff.

C. Hall Swaim, Hale & Dorr, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER ON QUESTION OF INSURANCE CONTRACTS

PAUL W. GLENNON, Bankruptcy Judge.

Liberty Mutual Insurance Company and Liberty Mutual Fire Insurance Company (hereinafter referred to collectively as "Liberty Mutual") timely filed an amended proof of claim for $179,087.00 against the debtor, Gladding Corporation (hereinafter, "the debtor" or "Gladding"). Liberty Mutual claims that the entire amount sought is entitled to priority status and should be paid in advance of all general unsecured claims. The debtor has objected to the claim on the ground that at least some portion of the debt should be treated as a general unsecured claim. The parties have stipulated that the threshold issue is whether the contracts were "executory" within

the meaning of § 313 (11 U.S.C. § 713) and § 70(b) (11 U.S.C. § 110) of the Bankruptcy Act of 1898.[1] Liberty Mutual's claim of priority, and the debtor's objection thereto, arise solely from opposing views on this issue. For the reasons which appear below, I conclude that the insurance agreements in question are not "executory contracts" within the meaning of the Act.

## FACTS

The following facts appear from the briefs submitted on this issue.[2] Liberty Mutual provided workmen's compensation insurance to Gladding on a "retrospective one year plan D premium endorsement", which means, that Gladding had agreed to pay as the final premium the total costs of any claims paid by Liberty Mutual, including a fee for Liberty Mutual's administrative expense, up to a certain maximum and down to a certain minimum. The maximum and minimum premium rates were to be computed from a hypothetical "standard premium", or that premium which would have been charged on a fixed rate or guaranteed premium. The maximum premium to Gladding was 150% of the "standard premium", while the minimum was 50% of that rate. However, the actual premium was not ascertainable until Liberty Mutual had paid all workers' claims for a given policy year or until both insurer and insured agreed to "close the books" on a policy-year. In the interim, Gladding would pay what were termed "estimated premiums", which were based upon personnel figures and salaries. As a result, one of the requirements was that Gladding make available to Liberty Mutual its books and records so that estimated premium adjustments could be made. The renewal policies had a stated term of one year ending May 15, 1977.

On April 9, 1977, the debtor[3] filed its Petition for Relief under Chapter XI of the Bankruptcy Act. On June 8, 1977 Liberty Mutual filed a Proof of Claim in the amount of $169,317.00, which was later amended on April 1, 1978 to $179,087.00. The amount was alleged to incorporate a premium adjustment for the effective period and was claimed to be payable in full as an administrative expense under § 64(a)(1) of the Act. 11 U.S.C. § 104(a)(1). It was further contended that the insurance policies were executory contracts which, because the debtor had continued to make estimated premium payments to Liberty Mutual until December 19, 1977 and had otherwise performed under the insurance contract, the debtor could be said to have affirmed, and that as a result, Gladding had become liable for all unpaid pre-petition premiums.

Gladding has disputed the amount of the claim and has challenged the priority by arguing that the insurance contracts in question were not executory, and therefore could not have been "assumed" by the debtor. Further, it argues that in fact the contracts were not assumed by the debtor since it never sought nor obtained court approval for such an assumption. Instead, it has applied to reject the contracts by Application dated December 7, 1978.[4] After an initial hearing on the matter, the parties have stipulated and the court has agreed to first decide the question of

1. The Bankruptcy Act was repealed by the Bankruptcy Reform Act of 1978, P.L. 95–598 (1978). However, the Reform Act retained the provisions of the 1898 Act for cases filed prior to October 1, 1979, of which this is one. Therefore, all references to sections of Title 11 of the United States Code are to the statute as it existed prior to its repeal.

2. The facts appear to be largely undisputed for purposes of this Memorandum, but the court makes no findings of fact at this time because there has been no full evidentiary hearing. Further, the parties have reserved the right to dispute any factual allegations at a subsequent

hearing. Nevertheless, for purposes of the question before me, I must of necessity make certain preliminary findings as to those matters which do not appear to be in dispute.

3. Gladding has a number of subsidiaries which filed jointly with the parent corporation and which are jointly administered with Gladding. For purposes of this memorandum, it suffices to speak only of Gladding.

4. The amended application to reject filed on January 8, 1979, includes policies issued by Liberty Mutual Fire Insurance Company.

whether the contracts in question are "executory" within the meaning of the Bankruptcy Act, such that they are capable of being assumed or rejected by the debtor. Extensive briefs having been filed by each side, the court is of the opinion that the contracts in question are not "executory contracts" within the meaning of the Act. This conclusion is based, in part, on the fact that the contracts in question are terminable at the will of either party, and because of the peculiar nature of insurance agreements in general.

## DISCUSSION

A debtor in possession under chapter XI of the Bankruptcy Act has all the powers of a trustee under the Act, Act § 342 (11 U.S.C. § 742), and therefore is vested with the authority to assume or reject "executory contracts", Act § 70b (11 U.S.C. § 110b), subject to court approval, Act § 313(1) (11 U.S.C. § 713). The Act does not define "executory contracts" other than to say that the term "includes unexpired leases of real property". Act § 306(4) (11 U.S.C. § 706).

> The definition of 'executory contracts' is not restrictive. It does not exclude other meanings of the words, which embrace contracts dealing with any subject matter, as long as some future performance is required of the debtor. 8 *Collier on Bankruptcy* ¶ 2.10, at p. 85 (14th ed. 1978).

Indeed, the definitional omission appears to have been intentional, in order that the courts might enjoy flexibility of construction in light of the purposes of the Act. However, as courts are wont to do, a popular definition has been adopted and generally applied. As proposed by Professor Vern Countryman, the definition of an "executory contract" in bankruptcy is the following:

> [A] contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other. V. Countryman, *Executory Con-*

*tracts in Bankruptcy* : Part I, 57 Minn.L. Rev. 439, 460 (1973).

Since its publication in 1973, this rather simple and clear definition has been used repeatedly by the bankruptcy courts, and appellate courts, in determining what contracts are "executory" within the meaning of the Act. The Countryman definition can be briefly stated as any contract which is materially "breachable" by *both* sides. Countryman's definition followed from his review of the judicial decisions prior to his article, and was an attempt by him to formulate an all-purpose definition which would comport with the case law to that date.

Since the Countryman article, however, the courts and the bar have seemingly adopted his definition as the exclusive test, without recognition of the intentional flexibility within the statute itself. As a result, the Countryman definition has been used in support of definitional conclusions without regard to the fundamental purposes of the Act.

However, at least two courts have sought to clarify, in light of the statute, the inquiry to be made when passing upon the question of whether a contract is executory for purposes of the Bankruptcy Act. In the case of *In re Jolly*, 574 F.2d 349 (6th Cir. 1978), *cert. denied*, 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978), the court addressed some of the limitations of the Countryman definition and stated:

> The key, it seems, to deciphering the meaning of the executory contract rejection provisions, is to work backward, proceeding from an examination of the purposes rejection is expected to accomplish. If those objectives have already been accomplished, or if they can't be accomplished through rejection, then the contract is not executory within the meaning of the Bankruptcy Act. *Id.* at 351

That statement by the Sixth Circuit Court of Appeals is an apparent departure from the Countryman rule. Countryman's definition is somewhat simpler and more easily applied in that the relevant facts may simply be plugged into the formula and a clear

answer produced. Yet, Countryman himself probably did not intend such a result, for he recognized the principle recited in *Jolly* : "The concept of the 'executory contract' in bankruptcy should be defined in light of the purpose for which the trustee is given the option to assume or reject". *Countryman, supra* at 450. Thus, it would appear that Professor Countryman recognized that no all-purpose definition of an "executory contract" in bankruptcy was possible, but that the courts could establish certain threshold elements of inquiry which could be useful.

In expanding upon *Jolly*, Bankruptcy Judge Ralph Mabey explored the problem further. In the case of *In re Booth*, 19 B.R. 53 (Bkrtcy.D.Utah 1982), he held that a contract for deed, where the debtor is vendee, should be viewed as a lien contract and not as an executory one. The basis of his decision was that by calling the contract a lien, the debtor (or trustee) could realize any equity which had been built up in the property, whereas if the contract were deemed executory, the vendor could enforce his right of forfeiture and deprive the estate of any value in the property. He analogized the situation to the one of a security interest disguised as a lease, which has been widely held to be a lien. He further concluded that treating the contract as a lien furthered the rehabilitation of the debtor, since the debtor could sell the property free of the lien, or "deal with it" in a plan. Calling it an executory contract would have prompted the problems associated with assumption of an executory contract, such as the cure of defaults and the adequate assurance of future performance, all of which are entitled to the status of costs of administration. Finally, he concluded that the vendors would be adequately protected by his ruling because, although their right to payment may not be adequately protected, their interest in the property would be and, as such, this struck a proper balance between vendors, other creditors, and the estate.

In his decision, Judge Mabey carefully analyzed the judicial erosion of the Countryman test, noting a number of examples where the courts' conclusions were inconsistent with the application of the rule. The "unexpired lease" was called the "archetype of the rejectable contract", yet "its treatment has varied depending upon the policies at stake". *In re Booth, supra* at 57, n.6. Judge Mabey noted that under the new Bankruptcy Code, "the exceptions virtually swallow the Countryman rule". *Id.* Yet, even under the Act, he noted numerous exceptions to the Countryman definition, such as security agreements, licenses of a patent, trademark, or copyright held by a bankrupt, public utilities, and collective bargaining compacts, all of which have been treated by the courts at one time or another as exceptions to the Countryman rule, and which have been decided on the basis of policy considerations.

It seems clear, at least to this court, that bankruptcy courts should not be bound by static definitions of what is an executory contract, but should strive to satisfy the purposes of the Act in conjunction with the goals of the debtor (or trustee), in order that equity may be served. Therefore, I would adopt the approach of *Booth* as the wiser course, although I have no doubt that, as Judge Mabey explained, the courts have been informally doing so all along. In so choosing, I do not think there is effected any repudiation of the Countryman rule, but merely a recognition of its function and its limitations. I am fairly certain that no contract which could not pass Countryman muster could ever be called "executory", within the meaning of the Act. On the other hand, Countryman sets out only the threshold inquiry, and leaves for the courts further considerations to determine whether a contract is "truly executory". On that basis, Countryman serves more as an "exclusionary" rule rather than as the ultimate test of an executory contract.

On the question of the insurance contracts before me, neither side has cited any authority directly on point. Moreover, the court's own research reveals only a very recent case, *In re New England Carpet Co.*, 18 B.R. 514, 8 B.C.D. 1121 (Bkrtcy.D.Vt. 1982), decided under the new Code, which applied the Countryman analysis to con-

clude that the particular insurance policies in question were "executory contracts" and could be assumed by the debtor. Because that decision did not follow the approach I have just set out, I do not find it to be compelling authority here.

█ Instead, an examination of these contracts leads me to conclude that they should be found not to be "executory" under the Act. Unlike the contract of deed where the debtor-vendee might have to forfeit his present interest, a debtor-insured retains his present interest in the policies whether they be assumed or not. That is, if the insurance was in force on the date of the filing and had not been previously cancelled, the insurer's liability was fixed as of that date, whether the debtor had previously performed or not. The insurance contracts are only terminable *in futuro*, and therefore the debtor's interest in maintaining them is only for the protection of its assets in the future. There is no forfeiture of past benefits. Likewise, the insurance company gains nothing by assumption of the contract, except the right to have its pre-petition debt paid ahead of general claims. Act § 64(a)(1) [11 U.S.C. § 104(a)(1)]. In this regard, the court sees no reason why insurers should be preferred over other general creditors, particularly where there is a comparable product available from others at a comparable price. The purpose of permitting a debtor to assume a contract is so that his estate might receive the benefit of it, and the benefit must of course outweigh the additional burdens being taken on. Yet, here, there would be a minimal benefit to the estate to be had in the event that the contracts were assumed, and a substantial burden. For this reason, it serves the policy of the Act and the debtor's reorganization goals best to treat the contracts as non-executory.

So, too, in the case of possible rejection of the contracts, there does not appear to be any benefit to be had for the estate in calling these contracts executory. Both sides may terminate the contracts at will, subject to possible notice requirements. Nevertheless, the contracts themselves provide for either party to reject them, and that right remains unaffected by the debt-

or's authority to assume or reject the contracts. See 8 *Collier on Bankruptcy*, ¶ 3.15[4] at p. 202 (14th ed. 1978); also, *In re Trigg*, 630 F.2d 1370 (10th Cir. 1980). Thus, no purpose under the Act can be served by calling the agreements "executory", for rejection of them is already part of the agreement and assumption of the contracts by the debtor could be defeated simply by Liberty Mutual's exercise of its cancellation rights under the policy.

█ Nor can the argument be made that the automatic stay in any way defeats the insurer's right to cancel under its policy, for Bankruptcy Rule 11-44(a) or even § 314 of the Act [11 U.S.C. § 714] are applicable only to certain judicial proceedings or judgments, or to certain acts of lien enforcement. Thus, the contracts are unaffected by the automatic stay, thereby minimizing any potential benefit to be gained by assumption of the contracts.

In light of the foregoing, the conclusion seems inescapable that the insurance contracts in question are not executory contracts within the meaning of the Act, but instead are at-will agreements which are neither assumable or rejectable by the debtor. There is no harm to Liberty Mutual in this, for it retains the benefit of its bargain, without unnecessarily obtaining advantage over other pre-petition creditors. The debtor is left with its right to reject the contract at no expense, and is not forced to assume it at great expense. Finally, in the event that the debtor is unable to obtain alternative insurance upon a notice of cancellation by Liberty Mutual, it is not without a remedy. This court, under its broad equity powers, could certainly enjoin the termination of the insurance until such alternative insurance could be found. Act § 2a(15) [11 U.S.C. § 11(a)(15)]; *Matter of Norman Industries, Inc.*, 1 B.R. 162 (Bkrtcy. W.D.La.1979). Furthermore, it is conceivable that where the debtor was otherwise unable to obtain other insurance, the court could enjoin the cancellation of the policies until their expiration, provided however, that the insurer was adequately compensated for any increased risk which might result from the court's action in compelling the insurer to provide coverage.

Accordingly, the following ORDER shall enter:

1. The insurance contracts in question above are found not to be "executory contracts" within the meaning of the Bankruptcy Act;

2. The Application to Reject Executory Contracts filed by Gladding is therefore DENIED;

3. A further hearing on Gladding's Objection to the Claim of Liberty Mutual shall be scheduled for Boston, Massachusetts on *September 16, 1982* at *10:00 A.M.*, at which time a conference shall be held to discuss the further disposition of the matter.