**In the Matter of B. SIEGEL COMPANY, a Michigan corporation, Debtor.**

**Bankruptcy No. 84–04327–B.**

United States Bankruptcy Court, E.D. Michigan, S.D.

July 18, 1985.

Joseph S. Radom, P.C. by Thomas B. Radom, Ruth P. Goldberg, Southfield, Mich., for debtor.

Sullivan, Ward & Bone, P.C. by Richard G. Ward, Detroit, Mich., for Centennial Ins. Co.

## MEMORANDUM OPINION

GEORGE BRODY, Bankruptcy Judge.

The question presented is whether an insurance contract is an executory contract and, if it is, whether the operation of an "at will" termination clause is limited by the prohibitions in section 365(e)(1) of the United States Bankruptcy Code. 11 U.S.C. § 365(e)(1).

The facts as stipulated by the parties and as developed at the evidentiary hearing are as follows:

1. Centennial Insurance Company issued a commercial insurance package policy to B. Siegel Company which provided for real and personal property, casualty, crime, business interruption and automobile insurance coverage for B. Siegel's retail women's apparel business on November 30, 1982. The policy was obtained for the debtor by its agent, Fairway Insurance Agency, Inc.

2. On December 2, 1983, Centennial Insurance Company was on the verge of cancelling B. Siegel's insurance policy because of nonpayment of premiums in the amount of $2,975.00. However, B. Siegel made the overdue payments on or about December 21, 1983, Centennial accepted the payments, and the policy continued in force.

3. On January 1, 1984, the policy originally issued was cancelled and rewritten. The policy as rewritten was issued for a period of three years beginning January 1, 1984. The policy provided that the premium was to be renegotiated on a yearly basis.[1] Changes in the premium rate were to be determined in accordance with a formula set forth in the policy. The policy contained a cancellation provision, which provided that it could be cancelled by the named insured at will and by the insurer upon thirty (30) days' written notice.[2]

4. On August 2, 1984, Centennial sent notice of cancellation to B. Siegel as a result of the nonpayment of premiums. On the same date, payment was received by Centennial and the policy was reinstated.

5. In November of 1984, Centennial began a review of B. Siegel's policy in order to determine the 1985 policy rate. To undertake this review, it requested a copy of B. Siegel's profit and loss statement from Fairway Insurance Agency, the agent through whom the policy was placed.

6. On December 14, 1984, an involuntary chapter 7 petition was filed against B. Siegel and Company. Upon motion by B. Siegel, the case was converted to chapter 11 on February 5, 1985.

7. On December 20, 1984, the Fairway Insurance Agency received a letter from Centennial Insurance Company stating that, "Due to the unstable financial stability of the [B. Siegel Company] please arrange to place all coverages elsewhere." And further stated that, "Direct notices will be sent out to the insured accordingly." On December 26, 1984, Centennial notified B. Siegel that, effective February 2, 1985, the debtor's insurance policy would be cancelled, and gave as a reason for cancellation, "company request."

---

**1.** The argument that the policy was an annual policy rather than a three year policy is untenable. The insurance policy clearly provides that it has a three year duration.

**2.** The insurer also provided that in the event of cancellation for nonpayment of premium, only fifteen (15) days' notice was required.

8. On February 1, 1985, the debtor filed a motion to restrain Centennial from cancelling the policy, contending that the proposed cancellation violated section 362(a) of the Bankruptcy Code and, additionally, that Centennial was prohibited from terminating the contract by virtue of section 365(e)(1). 11 U.S.C. § 362(a) and § 365(e)(1).

It is unnecessary to decide whether Centennial's sending a notice of cancellation to the debtor was a violation of the automatic stay, for it is clear that Centennial was prohibited by section 365(e)(1) from terminating the policy.

Section 365(e)(1) provides that an executory contract of a debtor may not be terminated

> ... at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on—
> (A) the insolvency or financial condition of the debtor at any time before the closing of the case;
> (B) the commencement of a case under this title; ....

11 U.S.C. § 365(e)(1).

■ The initial question to be resolved is whether an insurance policy issued for a term of three years and subject to annual rate renegotiations is an "executory contract" within the meaning of 11 U.S.C. § 365(e)(1).

Section 365 is the counterpart of section 70b of the Bankruptcy Act (former 11 U.S.C. § 110). The Bankruptcy Act did not define the meaning of the term "executory contract" as used in section 70b. However, Professor Countryman, in a scholarly article on executory contracts, suggested a definition. According to his definition, an executory contract is one "under which the obligation of both the bankrupt and the other party to a contract are so far unperformed that failure of either to complete performance would constitute a material breach excusing the performance of the other." *Executory Contracts in Bankruptcy, Part 1,* 57 Minn.L.Rev. 439, 460 (1973). When the Code was adopted, Congress again failed to define the term, apparently because it believed that "its general meaning is well understood, and any succinct statutory language risks an unintended omission or inclusion...." Report of the Commission on Bankruptcy Laws of the United States, H.R.Doc. No. 137, 93d Cong., 1st Sess., Part I, 199 (1973). However, the legislative history states that: "Though there is no precise definition of what contracts are executory, it generally includes contracts on which performance remains due to some extent on both sides." H.R.Rep. No. 595, 95th Cong., 1st Sess. 347 (1977) and S.Rep. No. 989, 95th Cong., 2d Sess. 58 (1978), *reprinted in* U.S.Code Cong. & Ad.News 5787, 5844 (S.Rep.) and 5963, 6303 (H.Rep.). The legislative history, in effect, adopts Professor Countryman's definition. The case law likewise employs the "performance due on both sides" definition. *See NLRB v. Bildisco and Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 1194 at n. 2, 79 L.Ed.2d 482; *Bankers' Trust Co. v. Gibbons (Matter of Chicago Rock Island & Pacific R. Co.),* 604 F.2d 1002, 1004 (7th Cir.1979); *Benevides v. Alexander (In re Alexander),* 670 F.2d 885, 887 (9th Cir.1982); *Matter of North American Dealer Group, Inc.,* 16 B.R. 996, 1000 (Bankr.E.D.N.Y.1982); *In re Fashion Two Twenty, Inc.,* 16 B.R. 784, 786 (Bankr.N.D. Ohio 1982); *New England Carpet Company v. Connecticut General Life Insurance Company (In re New England Carpet Company),* 18 B.R. 514, 516 (Bankr.D.Vt. 1982).

The policy of insurance imposed obligations of continuing performance on both the debtor and the insurance company—the obligation of Centennial to continue to provide insurance protection, and the obligation of the debtor to continue to promptly pay premiums. It is clearly an executory contract by reference to Professor Countryman's definition. *In re Garnas,* 38 B.R. 221 (Bankr.D.N.D.1984). And no convincing reason has been offered to justify rejecting the Countryman definition with respect to the contract in issue.

In contending that the Countryman definition should not apply, Centennial relies on *In re Gladding Corp.*, 22 B.R. 632 (Bankr.D.Mass.1982). Centennial's argument based upon *Gladding* is not persuasive.[3] *Gladding* was a Chapter XI case under the Bankruptcy Act of 1898. The insurance company asserted that its claim for unpaid prepetition premiums was entitled to be treated as an administrative expense. It reasoned that since the debtor had continued to perform its obligations under the executory insurance contract, the debtor had assumed the contract and converted the insurance company's otherwise unsecured claim into an administrative expense.

The trustee challenged Liberty Mutual's assertion that the prepetition claims were entitled to administrative expense status on the ground that the insurance contracts in question were not executory and, therefore, could not have been assumed by the debtor. The trustee additionally contended that, in any event, the contracts had not been assumed by the debtor since a court order authorizing assumption had never been obtained. The parties stipulated that the threshold issue was whether the contracts were executory within the meaning of section 70b of the Bankruptcy Act.

The court apparently agreed with the insurance company's argument that a debtor who continues to perform an executory contract "assumes" it and, consequently, if it held that the contract was executory, the insurance company's prepetition claim would be an expense of administration. The court was of the opinion that to accord administrative expense status to the insurance company's claim would be inequitable as to other unsecured creditors. To avoid this perceived inequity the court concluded, "it serves the policies of the Act and the debtor's reorganization goals best to treat the contracts as non-executory." *In re Gladding Corp.*, 22 B.R. at 636. Under the court's approach, the same contract may or may not be executory depending upon the context in which the issue arises. A debtor will assume a contract presumably only if it is beneficial for him to do so. If a contract is burdensome, the debtor will not, or at least should not, assume it. However, whether a contract is advantageous or burdensome to the estate does not determine whether a contract is or is not executory. The court's determination that the contract was not executory for the reason stated is unfortunate. " 'The estate always wins' is not a proper basis for legal decisions." MacDonald and Mintz, "Section 365: Executory Contracts" in *Lending Transactions and the Bankruptcy Code* 237, 243 (Practising Law Institute Commercial Law and Practice Course Handbook Series Number 300, 1983).[4]

**3.** The decision in *In re Gladding* relies heavily upon Judge Ralph Mabey's opinion in *In re Booth*, 19 B.R. 53 (Bankr.D.Utah 1982), which held that a contract for deed wherein the debtor is the vendee should be treated as a lien rather than as an executory contract. Judge Mabey reached this conclusion because of the potential loss of equity for the debtor if the transaction was to be viewed as an executory contract. Clearly, any adverse effects upon the debtor with which Judge Mabey was concerned are not present in the case now before the court. For a critique of *In re Booth, see* Weintraub and Resnick, *From the Bankruptcy Courts: What is an Executory Contract? A Challenge to the Countryman Test*, 15 U.C.C.L.J. 273, 274 (1983).

**4.** Actually, even if the contract had been held to be executory, Liberty's prepetition claim would not necessarily be entitled to administrative expense status. Although § 70b of the Bankruptcy Act of 1898 did not require, as does Bankruptcy Code § 365(a), court approval for the assumption of an executory contract, case law held that court approval was a necessary implication. *E.g., Texas Importing Company, Ltd. v. Banco Popular de Puerto Rico*, 360 F.2d 582, 584 (5th Cir.1966); *see also, survey of cases in, Sealy Uptown v. Kelly Lyn Franchise Company (In re Kelly Lyn Franchise Co., Inc.)*, 26 B.R. 441, 444 (Bankr.M.D.Tenn.1983) (majority and better rule under former Bankruptcy Act); *accord, In re Forgee Metal Products, Inc.*, 229 F.2d 799, 802 (3d Cir.1956) (court final determining authority of whether contract should be assumed). Since there was no court approved assumption in *Gladding*, the prepetition claim of the insurance company was nothing more than an unsecured claim. Thus, even if the court had held that the contract was executory, it did not automatically follow that the insurance company would gain an inequitable advantage over other creditors. The court's concerns speak more to the question of whether to withhold or grant its approval for

The question that remains is whether Centennial's cancellation of the contract is in violation of section 365(e)(1). Centennial contends that the policy of insurance was cancelled because of B. Siegel's repeated failure to timely pay premiums, the failure to provide a requested profit and loss statement to enable it to renegotiate the contract for the year 1985, and because of B. Siegel's unstable financial condition. Centennial additionally contends that since the policy provided that the contract was terminable at will, it was permitted to cancel the policy without any express reason.

The debtor was current in its premium payments when notice of cancellation was sent. There is, therefore, no basis for Centennial's contention that the policy was cancelled for the failure to pay the required premiums.

There is also no basis for Centennial's contention that it cancelled the policy for the reason that the debtor failed to submit the requested profit and loss statement. Pursuant to Centennial's request, the debtor submitted the profit and loss statement to Fairway on December 18, 1984. However, Fairway did not send the statement to Centennial because Centennial related it no longer had a need for the statement. Instead of renegotiating the policy rate, Centennial indicated to Fairway it intended to cancel the insurance policy because it had become aware that an involuntary bankruptcy petition had been filed against B. Siegel.[5] The evidence clearly establishes that the notice of cancellation was sent only because an involuntary petition was filed against B. Siegel. The notice of cancellation, therefore, had no effect since termination under such circumstances is expressly prohibited by section 365(e)(1).

Centennial contends, however, that the "terminable at will" clause permitted it to cancel the contract without giving any reason for cancellation, and thus there can be no violation of the prohibition contained in section 365(e)(1). This argument has no merit. "Policies of insurance are much the same as other contracts; they are matters of agreement by the parties. . . ." *Murphy v. Seed-Roberts Agency, Inc.*, 79 Mich.App. 1, 7, 261 N.W.2d 198 (1977). The contractual cancellation clause is therefore valid, *J.R. Watkins Co. v. Rich*, 254 Mich. 82, 235 N.W. 845 (1931), but "[i]t need not be read as requiring that an insurance company have the absolute right to cancel at its whim and caprice." *Murphy v. Seed-Roberts Agency, Inc.*, 79 Mich.App. at p. 8, 261 N.W.2d 198. An insurance company may not cancel an insurance policy even pursuant to an unrestricted right to cancel "when its purpose is to promote, encourage, or effect a violation of law." *L'Orange v. Medical Protective Company*, 394 F.2d 57, 59 (1968) (cancellation of medical malpractice insurance to coerce and intimidate dentist and prevent his testimony illegal breach of contract contrary to state law which made intimidation of witnesses a crime). *See, also, e.g., McNamara v. Gargett*, 68 Mich. 454, 36 N.W. 218 (1888) (contract illegal where based in part on consideration made void by public policy expressed in statute making illegal the taking of bonds, promissory notes, and other evidences of indebtedness in consideration for the sale of grain at a fictitious price); *accord, Murphy v. Seed-Roberts Agency*,

---

a rejection or assumption rather than to the issue of whether the contract was or was not executory. There is no question but that performance by a debtor under an executory contract after the filing of a petition in bankruptcy does not constitute assumption. 11 U.S.C. § 365(a); *Data-Link Systems, Inc. v. Whitcomb & Keller Mortgage Co., Inc.*, 715 F.2d 375, 9 Collier Bankr.Cas.2d 312 (7th Cir.1983); *In re Kelly Lyn Franchise Co., Inc.*, 26 B.R. 441 (Bankr.M.D.Tenn.1983); *In re Lafayette Radio Electronics Corp.*, 7 B.R. 189 (Bankr.E.D.N.Y. 1980).

**5.** On December 18, 1985, the *Detroit Free Press* carried an article which indicated that B. Siegel was forced into bankruptcy, and that a chapter 7 bankruptcy petition had been filed in the United States Bankruptcy Court in Detroit on behalf of thirty-nine creditors calling for the liquidation of the firm's assets under court supervision. This article was contained in Centennial's B. Siegel file (Debtor's exhibit no. 4).

*Inc.*, 79 Mich.App. at 11–14, 261 N.W.2d 198.

Under the Bankruptcy Act of 1898, clauses that permitted a party to terminate a contract in the event of bankruptcy were enforceable. Section 70b (former 11 U.S.C. § 110b.)[6] Congress, when it enacted the Bankruptcy Code in 1978, acknowledged what some courts had observed, namely, that the enforcement of such clauses worked substantial injustice and frustrated the salutary purpose of the reorganization provisions. *E.g., Queens Boulevard Wine & Liquor Corp. v. Blum*, 503 F.2d 202 (2d Cir.1974). To enhance the climate for rehabilitation, Congress in the Act of 1978 included section 365(e) which expressly prohibits termination of an executory contract because of the commencement of a bankruptcy case by or against the debtor. Centennial cancelled the contract because of the filing of an involuntary petition against the debtor. The cancellation contravened an expressed congressional policy. Centennial, therefore, did not have a right to cancel the policy for that reason. To permit Centennial to rely on the "terminable at will" clause when the only reason for its invocation is the bankruptcy of the debtor would, for all practical purposes, nullify the remedial policy of section 365(e)(1). A "terminable at will" clause is not to be so employed.

The cancellation is ineffective for an analogous reason. A "terminable at will" provision does not confer an unrestricted right to cancel a contract. Where the relationship between the parties "is commercial and does not involve fancy, taste, sensibility, judgment or other personal features, the option may be exercised only in good faith." *J.R. Watkins Company v. Rich*, 254 Mich. 82, 84, 235 N.W. 845 (1931). *See also, United Roasters, Inc. v. Colgate-Palmolive Co.*, 649 F.2d 985, 988–989 (4th Cir. 1981); and *Restatement (Second) of Contracts* § 205 comment e, Reporter's Notes,

99, 102, 104 (American Law Institute, 1979; Supp.1984) (discussions of common law duty of good faith in termination of contracts). Cancellation of a contract in violation of an express congressional enactment is not a good faith exercise of a "terminable at will" provision.

An appropriate order is to be submitted for entry.

---

**6.** For the treatment given such clauses under the Bankruptcy Act of 1898, *see Finn v. Meighan*, 325 U.S. 300, 301, 65 S.Ct. 1147, 1148–49, 89 L.Ed. 1624 (1944); *Queens Boulevard Wine &*

*Liquor Corp. v. Blum*, 503 F.2d 202, 204 (2d Cir.1974); *Weaver v. Hutson*, 459 F.2d 741 (4th Cir.) *cert. denied*, 409 U.S. 957, 93 S.Ct. 288, 34 L.Ed.2d 227 (1972).