In re The **ELDER–BEERMAN STORES CORP., et al., Debtors.**

The **ELDER–BEERMAN STORES CORP., Plaintiff,**

v.

**THOMASVILLE FURNITURE INDUS. INC., Defendant.**

Bankruptcy No. 95–33643.
Adv. No. 96–3047.

United States Bankruptcy Court,
S.D. Ohio,
Western Division.

May 3, 1996.

Richard M. Cieri, Cleveland, Ohio, for debtor.

Lawrence E. Oscar, Hahn Loeser & Parks, Cleveland, Ohio.

William B. Sullivan, Womble Carlyle Sandridge & Rice, Winston–Salem, North Carolina.

Richard A. Chesley, Jones, Day, Reavis & Pogue, Columbus, Ohio.

Randy T. Slovin, Mason Slovin & Schilling Co., L.P.A., Cincinnati, Ohio.

## DECISION AND ORDER FINDING VIOLATION OF AUTOMATIC STAY AND DENYING INJUNCTION

WILLIAM A. CLARK, Chief Judge.

### FINDINGS OF FACT

1. Plaintiff Elder–Beerman ("Elder–Beerman") is a corporation organized under the laws of the State of Ohio. Elder–Beerman is a complex enterprise engaged in the ownership, operation, and management of retail department stores, furniture stores, and related businesses throughout the United States.

2. Defendant Thomasville Furniture Industries, Inc. ("Thomasville") is a corporation organized under the laws of the State of Delaware, with its principal place of business in Thomasville, North Carolina. Thomasville is engaged in the business of manufacturing furniture and related products.

3. Elder–Beerman has purchased and distributed Thomasville products for over 35 years. As early as 1985, the parties entered into a written contract for the sale and distribution of Thomasville furniture products. That contract contained a provision allowing either party to terminate without cause. Over the years, the relationship between Elder–Beerman and Thomasville expanded, and other written agreements were entered into. All of the agreements allow for termination without cause.

4. From the beginning of the relationship between the parties and through the mid-1970s, the Thomasville furniture line was an integral part of the Elder–Beerman furniture operation. Thomasville gave Elder–Beerman instant name recognition in the furniture business, and helped bolster the performance of those departments, as well as the franchise as a whole.

5. Thomasville is well-respected in the furniture industry. Mr. Max Gutmann, CEO of Elder–Beerman, stated that Thomasville is a "fine name" and is an essential line within Elder–Beerman's furniture market. Ron Bultema, Elder–Beerman's Divisional Merchandising Manager, stated that Thomasville is the "foundation" of his business. Thomasville's share of Elder–Beerman's furniture business has been characterized as a "lion's share" (more than 40%).

6. Although Thomasville sales represent less than 1% of Elder–Beerman's total sales revenues, this figure is misleading. Thomasville acts as a promotional leader line for Elder–Beerman. That is, customers are attracted to shop at Elder–Beerman because of the Thomasville name. As such, having the Thomasville line in its stores contributes to sales for Elder–Beerman both inside and outside of the furniture line.

7. Because of Thomasville's wide range of products, it may take as many as six to nine vendors to replace Thomasville in the Elder–Beerman stores. Adding additional vendors will require significant changes in Elder–Beerman's operations. There are complications with multiple delivery sources and order deadlines, dealing with different representatives and invoices, advertising, and more vendors means less sales volume with each individual vendor, which in turn may mean less incentives offered to Elder–Beerman from each vendor. In addition, Elder–Beerman's salespeople must be retrained to sell the new vendors' products.

8. In the course of the parties' relationship, Elder–Beerman has also expended a great deal of time and money in order to meet with Thomasville's standards.

9. Between 1989 and 1994, Elder–Beerman renovated four of its stores in order to accommodate Thomasville Galleries. These Galleries were located at Elder–Beerman's Northtowne, Northwest, Southtown, and Fairborn locations.

10. In order to comply with Gallery Agreements, Elder–Beerman agreed to expend

substantial amounts of its own funds to renovate portions of its stores in accordance with Thomasville's Gallery blueprints. The total expenditures on these galleries exceed $300,000. Elder–Beerman constructed, painted, wallpapered, lit, and furnished the Gallery areas to Thomasville's specifications.

11. In addition to the significant amount of time and money that Elder–Beerman spent to build its Thomasville Galleries, Elder–Beerman also eliminated its relationships with other furniture manufacturers to make room for additional Thomasville lines. Elder–Beerman made these sacrifices because Thomasville offered a well-established, recognized name, quality products at the upper middle range of price points, and the opportunity to control distribution in the Dayton trading area.

12. Thomasville strongly supported its relationship with Elder–Beerman during 1994 and 1995. For example, on August 1, 1994, Michael Nesbit, Thomasville's representative to Elder–Beerman, wrote a memo to Bill Carrico, his supervisor, concerning the November grand opening of Elder–Beerman's fourth Thomasville Gallery at its Fairborn location. Because Thomasville was Elder–Beerman's "number one vendor and growing," Mr. Nesbit recommended that Thomasville offer Elder–Beerman support in the form of $22,500 of products discounts and cooperative advertising funds. As justification for this expenditure, Mr. Nesbit indicated his confidence that the Elder–Beerman relationship would continue to be profitable for Thomasville.

13. Other indicators show that Elder–Beerman's dealings in the Thomasville line prior to bankruptcy were productive. In March 1995, Thomasville approved Elder–Beerman for yet another Thomasville Gallery at its Salem Avenue store. And in September of 1995, Michael Nesbit, Elder Beerman's Thomasville representative, in an internal memorandum to his supervisor, Dave Scarangella, informed him Elder–Beerman was considering building up to five more Thomasville Galleries.

14. In addition, from 1993 through 1995, delivery and return problems from Elder–Beerman markedly decreased. During this period, Elder–Beerman's return ratio was less than Thomasville's national average.

15. The healthy relationship between Elder–Beerman and Thomasville continued into 1995. During that year, Elder–Beerman's sales of Thomasville furniture products "dramatically increased," according to Mr. Nesbit. Estimates show the sales figures increased from $1.6 million in 1994 to $2,226,000 in 1995. Moreover, projections for the 1996 fiscal year showed that Elder–Beerman would continue to grow, and could meet or exceed Thomasville's $3 million sales goal, goals which none of Thomasville's vendors had met in 1995.

16. On January 4, 1995, Mr. Nesbit recommended a "customized" discount program for Elder–Beerman that coordinated Thomasville's promotions with Elder–Beerman's advertising schedule. These flat-rate discounts allowed Elder–Beerman to better take advantage of Thomasville's discounts when planning its own sales. According to Mr. Nesbit, these discounts were "much more responsive to growing business with Elder–Beerman."

17. On September 11, 1995, Mr. Nesbit wrote another memo to Scarangella recommending strong support for Elder–Beerman's stores. In this memo, Mr. Nesbit pointed out that Elder–Beerman had already doubled its volume with Thomasville and added that Thomasville made up 25% of Elder–Beerman's total furniture business, and approximately 50% of its case goods business. Because Mr. Nesbit approved of Ron Bultema, Elder–Beerman's new Divisional Merchandising Manager, and thought that it "behooved" Thomasville to help stabilize Elder–Beerman, he recommended a flat-rate discount for the first half of 1996 and possibly the last quarter of 1995.

18. On October 10, 1995, just seven days before Elder–Beerman filed its bankruptcy petition, Mr. Nesbit again recommended that Thomasville offer Elder–Beerman special promotions that could be coordinat-

ed with Elder–Beerman's advertising schedule. These plans were approved by Mr. Scarangella on October 12, 1995.

19. Prior to the Chapter 11 petition, Thomasville had grown to represent 25% of Elder–Beerman's wood products business with projected annual sales in excess of $2.5 million. It has been estimated that termination of the Thomasville product line may result in lost sales of $750,000 in wood products and $400,000 in upholstery business.

20. On October 17, 1995, Elder–Beerman and certain of its subsidiaries filed voluntary petitions for protection under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), in this court.

21. Immediately upon the filing of Elder–Beerman's bankruptcy petition on October 17, 1995, the relationship between Elder–Beerman and Thomasville changed dramatically.

22. Thomasville notified Elder–Beerman that the customized promotional program designed specifically for Elder–Beerman by Thomasville had terminated with the bankruptcy petition. Thomasville never offered Elder–Beerman another discount or promotional incentive until April 12, 1996, just one week prior to the hearing April 19, 1996.

23. On October 18, 1995, Thomasville demanded that Elder–Beerman return all previously shipped merchandise. On October 19, 1995, Thomasville stopped all shipments to Elder–Beerman. Thomasville did not resume shipments until Elder–Beerman furnished Thomasville with a $300,000 security, in early December.

24. On October 20, 1995, Charles Shaffer, Elder–Beerman's General Merchandising Manager, and Ron Bultema met with Thomasville representatives to discuss the bankruptcy filing. Thomasville had already, earlier in the day, taken steps to replace Elder–Beerman as they met with Larry Klaben of Morris Furniture, an Elder–Beerman competitor in Dayton.

25. At the October 20th meeting, Ron Berrier, Thomasville's Treasurer, expressed Thomasville's "extreme displeasure over the filing and emphatically indicated that (Thomasville) would not ship orders in the backlogue [sic]." In addition, Terry Funk, Thomasville's Credit Manager, asked how Elder–Beerman was able to file for bankruptcy given the fact that it had an $80 million net worth. Finally, Mr. Berrier, on behalf of Thomasville, expressly stated, "we [have] no intention of continuing to do business with [Elder–Beerman]."

26. Thomasville has offered Elder–Beerman little or no support since the bankruptcy petition. Mr. Nesbit, Thomasville's representative to Elder–Beerman, has stopped his once regular store visits. Thomasville invited the president of Morris Furniture to the Midwest Dealer's Meeting, sponsored by Thomasville, in Chicago, Illinois, yet failed to invite representatives from Elder–Beerman. In addition, Thomasville failed to offer Elder–Beerman any of its regular factory discounts until the week prior to a hearing on April 19, 1996.

27. On January 22, 1996, Thomasville sent notice to Elder–Beerman that Thomasville was severing the parties' long-standing relationship. In the notice Thomasville stated that it would "allow orders for a 60–day period to allow [Elder–Beerman] to balance inventory and process sold orders."

28. On March 14, 1996, before the expiration of the 60–day period, Elder–Beerman filed a Verified Complaint for Injunctive Relief. On the same day, Elder–Beerman moved for a temporary restraining order and a preliminary injunction. This court issued its Temporary Restraining Order (the "Order") on that date.

29. On March 22, 1996, Elder–Beerman filed its First Amended Complaint which, in addition to seeking injunctive relief, requested damages for Thomasville's breach of contract, both express and implied.

30. Subsequent to a hearing on April 19, 1996, both parties have adjusted their pleadings to address issues of the automatic stay. The matter currently before the court is Elder–Beerman's Emergency Motion for Preliminary Injunction, and request for injunctive relief under Elder–Beerman's First Amended Complaint.

## CONCLUSIONS OF LAW

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) & 1334. This proceeding constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) & (O).

Procedurally, this matter arose from Elder–Beerman's request for a preliminary injunction. It is clear, however, that the parties now recognize that the underlying legal principle is the automatic stay, and that so long as the stay remains in effect, other injunctive relief is inappropriate.

Had the parties not raised the issue of the automatic stay, the court would still be empowered to address stay violations *sua sponte*. *In re Laventhol & Horwath*, 139 B.R. 109, 116 n. 6 (S.D.N.Y.1992) ("[I]f necessary, the Bankruptcy Court could *sua sponte* modify the automatic stay...."); *Furness v. Lilienfield*, 35 B.R. 1006 (D.Md.1983) (modifying stay *sua sponte*); *Putnam County Sav. Bank v. Bagen (In re Bagen)*, 185 B.R. 691, 701 (Bankr.S.D.N.Y.1995) (modifying the stay *sua sponte*); *Swift v. Bellucci (In re Bellucci)*, 119 B.R. 763, 779 (Bankr.E.D.Cal. 1990) ("[B]ankruptcy courts may lift the automatic stay *sua sponte* notwithstanding the language in section 362(d) that permits a 'party in interest' to seek relief from the automatic stay."); *James v. Draper (In re James)*, 112 B.R. 687, 700 (Bankr.E.D.Pa.), *aff'd in part, vacated in part on other grounds*, 120 B.R. 802 (E.D.Pa.1990), *rev'd on other grounds*, 940 F.2d 46 (3d Cir.1991) ("The court is obliged to raise the issue of the application of the automatic stay *sua sponte*."); *In re Clark*, 69 B.R. 885, 890 n. 1 (Bankr.E.D.Pa.1987) ("[W]e have a duty to raise obvious defenses to, as well as the issue of, the impact of the stay *sua sponte*.").

■ Bankruptcy courts then have the power, whether on the request of a party in interest or *sua sponte*, to consider both what acts constitute a violation of the stay and whether or not relief from stay is appropriate. The matter of relief from stay has already been considered in a separately issued decision, where the court declined to annul or terminate the stay. The court therefore concerns itself here solely with determining whether or not Thomasville's attempted termination on January 22, 1996, was in violation of the automatic stay, and subsequently what effect that determination has on Elder–Beerman's request for injunctive relief.

■ The stay protection in § 362 is "automatic and mandatory" with the filing of the petition. *Cathey v. Johns–Manville Sales Corp.*, 711 F.2d 60, 62 (6th Cir.1983). The debtor need not make any motion in the bankruptcy court to invoke its protection. *Ostano Commerzanstalt v. Telewide Sys., Inc.*, 790 F.2d 206, 207 (2d Cir.1986).

The automatic stay protects against "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3) (1994).

Property of the estate is defined in 11 U.S.C. § 541(a). Such property includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (1994). The legislative history to § 541 indicates property of the estate is to be interpreted quite broadly. "It includes all kinds of property, including tangible or intangible property [and] causes of action...." H.R.Rep. No. 595, 95th Cong., 1st Sess. 367–68 (1977), *reprinted in* 1978 U.S.C.C.A.N. at 5963, 6323 (1978).

Courts have consistently held that contract rights are property of the estate, and that therefore those rights are protected by the automatic stay. *Pester Refining Co. v. Insurance Co. of North Am. (In re Pester Refining)*, 58 B.R. 189, 192 (Bankr.S.D.Iowa 1985) ("Contractual rights constitute intangible property which is included within the definition of property of the estate"); *Wegner Farms Co. v. Merchants Bonding Co. (In re Wegner Farms Co.)*, 49 B.R. 440, 443 (Bankr.N.D.Iowa 1985) (same); *Varisco v. Oroweat Food Co. (In re Varisco)*, 16 B.R. 634, 637 (Bankr.M.D.Fla.1981) (same); *accord In re Cardinal Industries, Inc.*, 116 B.R. 964, 971 (Bankr.S.D.Ohio 1990).

Courts have also consistently held that the automatic stay also applies to notices of termination. *Rogue Valley Stations, Inc. v. Birk Oil Co.*, 568 F.Supp. 337, 348 (D.Or.

1983) ("automatic stay prevents franchisor from sending notice of termination or nonrenewal without first securing appropriate relief from stay from the Bankruptcy Court"); *A. Dan Chisholm, Inc. v. B.P. Oil Inc. (In re A. Dan Chisholm, Inc.),* 57 B.R. 718, 719–20 (Bankr.M.D.Fla.1986) ("Any notice [of termination] sent in violation of the automatic stay is void and without effect").

As in the instant case, courts have not hesitated to retain the stay, even when one party would otherwise have the power to terminate "at will." This result is best demonstrated in the area of insurance policies. *Minoco Group of Cos., Ltd. v. First State Underwriters Agency of New England Reins. Corp. (In re Minoco Group of Cos., Ltd.),* 799 F.2d 517, 519 (9th Cir.1986) (staying the right to cancel insurance policy under § 362); *Pester Refining Co. v. Insurance Co. of North Am. (In re Pester Refining Co.),* 58 B.R. 189, 192 (Bankr.S.D.Ia.1985); *In re B. Siegel Co.,* 51 B.R. 159, 163–64 (Bankr. E.D.Mich.1985); *In re Garnas (Garnas v. American Family Mut. Ins. Co.),* 38 B.R. 221, 223–24 (Bankr.D.N.D.1984).

■ Thus while parties may otherwise be permitted to terminate an agreement under state contract law, in bankruptcy such a termination would be in violation of the stay, and the parties must seek permission of the court to act. *Computer Communications, Inc. v. Codex Corporation (In re Computer Communications, Inc.),* 824 F.2d 725, 729 (9th Cir.1987) (holding that even an unassumable executory contract would be protected from termination by the automatic stay); *In re M.J. & K. Co., Inc.,* 161 B.R. 586, 595 (Bankr.S.D.N.Y.1993) (granting relief from stay for law school to exercise at will termination clause against debtor); *Sanden v. Chautauqua Capital Corp. (In re Chautauqua Capital Corp.),* 135 B.R. 779 (Bankr. W.D.Pa.1992) (granting relief from stay for landlord to evict tenant at will); *Coates v. Peachtree Apartments (In re Coates ),* 108 B.R. 823, 826 (Bankr.M.D.Ga.1989) ("[E]ven a month-to-month tenancy at will is property of the estate which debtor's landlord cannot terminate until the landlord obtains relief from the automatic stay."); *Schewe v. Fair-*

*view Estates (In re Schewe ),* 94 B.R. 938 (Bankr.W.D.Mich.1989) (same).

Finally, much time and energy by the parties has been spent arguing whether or not this contract is executory, and if it is, whether § 365(e)(1) should apply. Because of the court's holding on the automatic stay, which applies whether or not the contract is executory, *In re Pester Refining,* 58 B.R. at 191, this issue has become moot.

■ It is therefore clear, that Thomasville's actions in attempting to cancel its contract with Elder–Beerman were in violation of the automatic stay.

The treatment of violations of the stay has varied within the Circuits. The Bankruptcy Code does not state whether such acts are to be treated as void or voidable. Until recently each of the Circuits but one that had considered the void/voidable question had concluded that actions taken in violation of the automatic stay are void. *See In re Smith Corset Shops, Inc.,* 696 F.2d 971, 976 (1st Cir.1982); *In re 48th Street Steakhouse, Inc.,* 835 F.2d 427, 431 (2d Cir.1987), *cert. denied,* 485 U.S. 1035, 108 S.Ct. 1596, 99 L.Ed.2d 910 (1988); *Raymark Indus., Inc. v. Lai,* 973 F.2d 1125, 1132 (3d Cir.1992); *N.L.R.B. v. Edward Cooper Painting, Inc.,* 804 F.2d 934, 940 (6th Cir.1986); *Matthews v. Rosene,* 739 F.2d 249, 251 (7th Cir.1984); *In re Schwartz,* 954 F.2d 569, 574 (9th Cir.1992); *In re Calder,* 907 F.2d 953, 956 (10th Cir.1990); *Borg–Warner Acceptance Corp. v. Hall,* 685 F.2d 1306, 1308 (11th Cir.1982); *Bronson v. U.S.,* 46 F.3d 1573, 1579 (Fed.Cir.1995). *But see Picco v. Global Marine Drilling Co.,* 900 F.2d 846 (5th Cir.1990) ("[A]ctions taken in violation of an automatic stay are not void.").

The Sixth Circuit, however, has recently reversed its position, holding that actions taken in violation of the automatic stay are not void, but voidable. *Easley v. Pettibone Michigan Corp.,* 990 F.2d 905, 909–11 (6th Cir.1993). Implicit in the Sixth Circuit's reasoning is that as void acts are incapable of cure, the power to cure past violations by annulling under § 362(d) precludes these violations from being void. *Easley,* 990 F.2d at 910. They must, therefore, be voidable. *Id.* In so doing, however, the Circuit made it clear that in general violations should still be

treated as void, that "any exception to the stay must be applied sparingly." *Easley,* 990 F.2d at 911 (quoting *In re Smith,* 876 F.2d 524 (6th Cir.1989)).

While it is therefore clear that Thomasville's actions were in violation of the automatic stay and thus technically voidable, *Easley* also makes it clear that in general these acts will be treated as void.

It is the court's conclusion that Thomasville's attempted termination of the contract should be treated as void *ab initio,* and that the contract is presently intact. As this court has previously declined to terminate, annul, modify, or condition the stay, the stay remains in effect. There is therefore no immediate danger of the sales distribution contract being terminated. Consequently, Plaintiff's request for injunctive relief against Thomasville and Morris Furniture Co., Inc. is moot, and should be, and hereby is DENIED.

The court sets a pretrial telephone conference on the Second Cause of Action in the complaint and on the issue of 11 U.S.C. § 362(h) damages for *Thursday, May 16, 1996, at 10:00 a.m.,* and a hearing for damages arising from the breach of sales and distribution contract and violation of the automatic stay for *Tuesday, July 2, 1996, at 9:30 a.m.*