In the Matter of THOMAS B. HAMILTON COMPANY, INC., d/b/a Patricia Ann's Sterling, Debtor.

CITIZENS & SOUTHERN NATIONAL BANK, Movant,

v.

THOMAS B. HAMILTON COMPANY, INC., d/b/a Patricia Ann's Sterling, Respondent.

Bankruptcy No. A89–06715–JB.

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

June 5, 1990.

Lori P. Hughes, Alston & Bird, Atlanta, Ga., for movant.

Richard K. Valldejuli, Jr., Atlanta, Ga., for debtor/respondent.

## ORDER

W. HOMER DRAKE, Jr., Bankruptcy Judge.

This matter is before the Court on the Motion of Citizens and Southern National Bank ("C & S") for Relief from Automatic Stay filed on February 14, 1990. It is a core proceeding over which the Court has jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(G) (1990). A hearing on the motion was held on March 23, 1990, after which the parties filed supplemental post-hearing briefs. Having considered these briefs, the testimony at the hearing and the record in the case file, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

The following facts are offered by C & S and are not disputed by Debtor. Thomas B. Hamilton Co., Inc., d/b/a Patricia Ann's Sterling ("Debtor") is a retail merchant that buys and sells finished sterling silver products. Most of its business is credit card sales received through telephone and mail orders. Debtor executed a Card Program Member Agreement (the "Agreement") with C & S on or about April 9, 1980 which allows Debtor to accept Master-Card and Visa credit cards in the course of its business with the proceeds from the credit card sales being deposited in a C & S depository account. The Agreement provides that either party may terminate at any time upon ten days written notice.

Because of the nature of Debtor's business, the credit card receipts submitted by Debtor are generally not signed by the cardholder, nor are they imprinted with the credit card. Instead, Debtor receives orders and credit card numbers either verbally over the phone or from order forms received in the mail, and then enters the card numbers, sales amount, card expiration dates and authorization codes, if necessary, in its point-of-sale terminal. The sales accumulate in a computer system until Debtor releases them; this "batch release" essentially totals the accumulated credit card transactions and creates a deposit which is posted to Debtor's depository account. Funds are available for withdrawal two days after the release.

After the "batch release," the information regarding the transactions is transmitted electronically to MasterCard and Visa, who separate the transactions and transmit them to the issuers of the credit cards. The issuers then post the transactions to the cardholders' accounts and issue monthly statements. After the receipt of the statements, cardholders have approximately seven and one-half months to elect to dispute sales and an indefinite period of time to assert claims and defenses arising out of the transactions against the issuers, pursuant to the Consumer Credit Protection Act and Mastercard and Visa operating rules and regulations. When a cardholder disputes a sale or asserts claims or defenses, the issuer has a right of charge-back against C & S, who has a right of chargeback against Debtor.

Debtor filed its Chapter 11 petition on June 26, 1989, after which C & S asked Debtor to complete a new application for a merchant agreement. On October 2, 1989, the application was rejected because of the increased financial risks arising from the nature of Debtor's business as described above, and because of Debtor's unstable financial condition. Because of these financial risks, C & S filed the present motion seeking to terminate the existing Agreement in accordance with its termination clause. C & S contends that the Agreement is a "financial accommodation" contract which cannot be assumed by Debtor under § 365 of the Bankruptcy Code; Debtor responds that it is an assumable executory contract in which C & S performs a "clearing house" service to Debtor.

## CONCLUSIONS OF LAW

Although C & S moved for relief from the automatic stay, its request for a determination that it is not prevented from terminating the Agreement and that Debtor may not assume the Agreement directly invokes § 365 of the Code, which governs

executory contracts.[1] According to § 365(e)(1), an executory contract of a debtor may not be terminated or modified at any time after the commencement of the case solely because of a provision in such contract that is conditioned on the insolvency or financial condition of the debtor at any time before the closing of the case, 11 U.S.C. § 365(e)(1)(A) (1990), but contracts "to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor," are excepted from this prohibition, 11 U.S.C. § 365(e)(2)(B) (1990). Similarly, a trustee may assume any executory contract of the debtor pursuant to § 365(a) except for these "financial accommodation" contracts, 11 U.S.C. § 365(c)(2) (1990).

The question that this Court must answer is whether the Agreement was a "financial accommodation" contract under the meaning of these provisions. The provisions are generally given a non-expansive construction, *In re United Press Intern., Inc.*, 55 B.R. 63, 66 (Bankr.D.D.C.1985), and are applied to actual extensions of cash or lines of credit rather than to ordinary leases or contracts to provide goods or services, *In re Charrington Worldwide Ent., Inc.*, 98 B.R. 65, 68 (Bankr.M.D.Fla. 1989), *aff'd* 110 B.R. 973 (M.D.Fla.1990) (airline ticket "clearing house" agreement was assumable contract); *In re Wills Travel Service, Inc.*, 72 B.R. 380, 382 (Bankr.M. D.Fla.1987), *reh'g granted,* 87 B.R. 690 (Bankr.M.D.Fla.1988) (same); *In re Farrell*, 79 B.R. 300, 304 (Bankr.S.D.Oh.1987) (vehicle lease assumable).

Because Debtor is allowed to withdraw funds based on credit card receipts deposited in the depository account before C & S receives credit for the receipts from Visa or MasterCard, C & S contends that the Agreement falls within the scope of these provisions. C & S also argues that Debtor may withdraw funds from the account even though the cardholder may dispute its bill and withhold payment for many months after the transaction pending resolution of the dispute, and when a bill is disputed against the issuer of the credit card, the sale is charged back against C & S whose recourse is against Debtor. Because Debtor's deposits consist of unsigned and unimprinted sales drafts, there is no verification of the transactions, making the chargebacks indefensible and adding to the risk to which C & S subjects itself. C & S therefore characterizes the Agreement as an indirect extension of credit to Debtor.

This Court disagrees. Just because the contract allows a debtor to withdraw funds without having sufficient funds in the depository account does not make it a "financial accommodation" contract; such an interpretation "would turn every contract into a financial accommodation contract where a debtor owes any money to a claimant from whom it obtained either goods or services," *In re The Travel Shoppe, Inc.*, 88 B.R. 466, (Bankr.N.D.Ga.1988), thereby allowing the exception to swallow the rule, *Id.; Charrington Worldwide Ent.*, 98 B.R. at 69. The same is true of C & S' exposure to chargebacks from the credit card companies. All contracts hold varying degrees of financial risk, and some contracts allow dissatisfied persons to have recourse against accommodating parties, but the degree of exposure of the parties does not determine whether an executory contract may be assumed or rejected. Instead, one must concentrate on the central purpose of the contract, *see In re Charrington Worldwide Ent., Inc.*, 110 B.R. 973, 975 (M.D.Fla. 1990).

The purpose of the Agreement in the present case is to provide a service to Debtor by facilitating transactions with Visa and MasterCard holders, not to loan money or provide credit to Debtor. The Court agrees with Debtor that the Agreement resembles the airline ticket "clearing house" agreements in *Charrington World-*

---

1. Although the Code imposes a stay on any act to obtain possession of or exercise control over property of the estate, 11 U.S.C. § 362(a)(3) (1990), and property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case," 11 U.S.C. § 541(a)(1) (1990), which may include a debtor's property interest in an executory contract, the fact that § 365(e)(2)(B) provides for the termination of such a contract makes the issue of the automatic stay anomalous, *see In re Watts*, 876 F.2d 1090, 1095-6 (3rd Cir.1989).

*wide Ent.* and in *Wills Travel Service,* wherein the Airlines Reporting Corporation ("ARC") furnished blank airline tickets to travel agencies to be sold to individual travelers, and the airlines demanded immediate payment from ARC, who were reimbursed from the agencies' compensation funds composed of payments from the travelers. In this way the ARC facilitated transactions between travelers and the airlines, and in both cases the Bankruptcy Court for the Middle District of Florida ruled that the agreements were not "financial accommodation" contracts, *Charrington Worldwide Ent.,* 98 B.R. at 68; *Wills Travel Service,* 72 B.R. at 382. Similarly, C & S serves as a "clearing house" for credit card transactions between Debtor and Debtor's customers. After "batch release" deposits from Debtor into a C & S depository account, C & S wires credit card transaction information derived from Debtor's credit slips to MasterCard and Visa who transmit them to the issuers of the credit cards, and these issuers then pay C & S and bill the cardholders. By performing this service for Debtor, C & S did not contract to be a lender to Debtor.

C & S prefers to liken the Agreement to the insurance agreement in *In re Placid Oil Co.,* 72 B.R. 135 (Bankr.N.D.Tex.1987), in which an insurer paid third party claims against the debtor and the debtor paid premiums based on estimates of various fees and expenses for which monthly cash payments were to be made, and based on estimates of payments made on claims for which interest-bearing demand notes were given. The debtor also provided a surety bond as security for its performance. The Court ruled that, because the insurer provided insurance services in advance of payment, the insurer was extending credit for the debtor and that the agreement was a "financial accommodation" contract, *Id.* at 139. It is apparent from the use of demand notes and a surety bond in the agreement that the insurer contracted to do more than facilitate the debtor's transactions and that it intended to enter a financial arrangement. The focal point of the agreement was to extend credit to the debtor, and the demand notes and the surety

bond were implemented to protect the insurer from the risk of loss. The absence of these security measures in the present Agreement indicates that the financial exposure of C & S was incidental to rather than a focal point of the contract. As a result the Agreement is more fairly described as a service contract rather than a "financial accommodation" contract.

As a final point of comparison, the Agreement is strikingly similar to an ordinary checking account arrangement, except that instead of a check being drawn on the bank, Debtor is drawing on a credit card charge slip. Although checking accounts facilitate the customer's transactions and the bank bears the risk of crediting the customer for bad or forged checks, it would delimit the narrow exception of §§ 365(c)(2) and 365(e)(2)(B) to consider these ordinary banking agreements to be "financial accommodation" contracts. Admittedly, these credit card slips are not signed or imprinted with the credit card, and there are specific rules that allow a cardholder seven (7) months to object to any charges made on the credit card. However, the increased amount of risk to C & S resulting from these differences does not change the nature of the service that the bank provides. This Court therefore concludes that the Agreement is not a "financial accommodation" contract terminable under § 365(e)(2)(B), and that Debtor is not prevented by § 365(c)(2) from assuming the Agreement. Accordingly, C & S' Motion for Relief from Stay is DENIED.

The Clerk is directed to serve a copy of this Order to the movant's attorney, the debtor, the debtor's attorney, and the United States Trustee.

IT IS SO ORDERED.