In re The ELDER–BEERMAN STORES CORP., et al., Debtors.

Bankruptcy No. 95–33643.

United States Bankruptcy Court,
S.D. Ohio,
Western Division.

May 3, 1996.

See also 195 B.R. 1019.

Richard M. Cieri, Cleveland, Ohio, for debtors.

Lawrence E. Oscar, Hahn Loeser & Parks, Cleveland, Ohio.

William B. Sullivan, Womble Carlyle Sandridge & Rice, Winston–Salem, North Carolina.

Richard A. Chesley, Jones, Day, Reavis & Pogue, Columbus, Ohio.

Randy T. Slovin, Mason Slovin & Schilling Co., L.P.A., Cincinnati, Ohio.

## DECISION AND ORDER DENYING ANNULMENT OF AUTOMATIC STAY

WILLIAM A. CLARK, Chief Judge.

### FINDINGS OF FACT

1. Plaintiff Elder–Beerman ("Elder–Beerman") is a corporation organized under the laws of the State of Ohio. Elder–Beerman is a complex enterprise engaged in the ownership, operation, and management of retail department stores, furniture stores, and related businesses throughout the United States.

2. Defendant Thomasville Furniture Industries, Inc. ("Thomasville") is a corporation organized under the laws of the State of Delaware, with its principal place of business in Thomasville, North Carolina. Thomasville is engaged in the business of manufacturing furniture and related products.

3. Elder–Beerman has purchased and distributed Thomasville products for over 35 years. As early as 1985, the parties entered into a written contract for the sale and distribution of Thomasville fur-

niture products. That contract contained a provision allowing either party to terminate without cause. Over the years, the relationship between Elder–Beerman and Thomasville expanded, and other written agreements were entered into. All of the agreements allow for termination without cause.

4. From the beginning of the relationship between the parties and through the mid-1970s, the Thomasville furniture line was an integral part of the Elder–Beerman furniture operation. Thomasville gave Elder–Beerman instant name recognition in the furniture business, and helped bolster the performance of those departments, as well as the franchise as a whole.

5. Thomasville is well-respected in the furniture industry. Mr. Max Gutmann, CEO of Elder–Beerman, stated that Thomasville is a "fine name" and is an essential line within Elder–Beerman's furniture market. Ron Bultema, Elder–Beerman's Divisional Merchandising Manager, stated that Thomasville is the "foundation" of his business. Thomasville's share of Elder–Beerman's furniture business has been characterized as a "lion's share" (more than 40%).

6. Although Thomasville sales represent less than 1% of Elder–Beerman's total sales revenues, this figure is misleading. Thomasville acts as a promotional leader line for Elder–Beerman. That is, customers are attracted to shop at Elder–Beerman because of the Thomasville name. As such, having the Thomasville line in its stores contributes to sales for Elder–Beerman both inside and outside of the furniture line.

7. Because of Thomasville's wide range of products, it may take as many as six to nine vendors to replace Thomasville in the Elder–Beerman stores. Adding additional vendors will require significant changes in Elder–Beerman's operations. There are complications with multiple delivery sources and order deadlines, dealing with different representatives and invoices, advertising, and more vendors means less sales volume with each individual vendor, which in turn may mean less incentives offered to Elder–Beerman from each vendor. In addition, Elder–Beerman's salespeople must be retrained to sell the new vendors' products.

8. In the course of the parties' relationship, Elder–Beerman has also expended a great deal of time and money in order to meet with Thomasville's standards.

9. Between 1989 and 1994, Elder–Beerman renovated four of its stores in order to accommodate Thomasville Galleries. These Galleries were located at Elder–Beerman's Northtowne, Northwest, Southtown, and Fairborn locations.

10. In order to comply with Gallery Agreements, Elder–Beerman agreed to expend substantial amounts of its own funds to renovate portions of its stores in accordance with Thomasville's Gallery blueprints. The total expenditures on these galleries exceed $300,000. Elder–Beerman constructed, painted, wallpapered, lit, and furnished the Gallery areas to Thomasville's specifications.

11. In addition to the significant amount of time and money that Elder–Beerman spent to build its Thomasville Galleries, Elder–Beerman also eliminated its relationships with other furniture manufacturers to make room for additional Thomasville lines. Elder–Beerman made these sacrifices because Thomasville offered a well-established, recognized name, quality products at the upper middle range of price points, and the opportunity to control distribution in the Dayton trading area.

12. Thomasville strongly supported its relationship with Elder–Beerman during 1994 and 1995. For example, on August 1, 1994, Michael Nesbit, Thomasville's representative to Elder–Beerman, wrote a memo to Bill Carrico, his supervisor, concerning the November grand opening of Elder–Beerman's fourth Thomasville Gallery at its Fairborn location. Because Thomasville was Elder–Beerman's "number one ven-

dor and growing," Mr. Nesbit recommended that Thomasville offer Elder–Beerman support in the form of $22,500 of products discounts and cooperative advertising funds. As justification for this expenditure, Mr. Nesbit indicated his confidence that the Elder–Beerman relationship would continue to be profitable for Thomasville.

13. Other indicators show that Elder–Beerman's dealings in the Thomasville line prior to bankruptcy were productive. In March 1995, Thomasville approved Elder–Beerman for yet another Thomasville Gallery at its Salem Avenue store. And in September of 1995, Michael Nesbit, Elder Beerman's Thomasville representative, in an internal memorandum to his supervisor, Dave Scarangella, informed him Elder–Beerman was considering building up to five more Thomasville Galleries.

14. In addition, from 1993 through 1995, delivery and return problems from Elder–Beerman markedly decreased. During this period, Elder–Beerman's return ratio was less than Thomasville's national average.

15. The healthy relationship between Elder–Beerman and Thomasville continued into 1995. During that year, Elder–Beerman's sales of Thomasville furniture products "dramatically increased," according to Mr. Nesbit. Estimates show the sales figures increased from $1.6 million in 1994 to $ 2,226,000 in 1995. Moreover, projections for the 1996 fiscal year showed that Elder–Beerman would continue to grow, and could meet or exceed Thomasville's $3 million sales goal, goals which none of Thomasville's vendors had met in 1995.

16. On January 4, 1995, Mr. Nesbit recommended a "customized" discount program for Elder–Beerman that coordinated Thomasville's promotions with Elder–Beerman's advertising schedule. These flat-rate discounts allowed Elder–Beerman to better take advantage of Thomasville's discounts when planning its own sales. According to Mr. Nesbit, these discounts were "much more re-sponsive to growing business with Elder–Beerman."

17. On September 11, 1995, Mr. Nesbit wrote another memo to Scarangella recommending strong support for Elder–Beerman's stores. In this memo, Mr. Nesbit pointed out that Elder–Beerman had already doubled its volume with Thomasville and added that Thomasville made up 25% of Elder–Beerman's total furniture business, and approximately 50% of its case goods business. Because Mr. Nesbit approved of Ron Bultema, Elder–Beerman's new Divisional Merchandising Manager, and thought that it "behooved" Thomasville to help stabilize Elder–Beerman, he recommended a flat-rate discount for the first half of 1996 and possibly the last quarter of 1995.

18. On October 10, 1995, just seven days before Elder–Beerman filed its bankruptcy petition, Mr. Nesbit again recommended that Thomasville offer Elder–Beerman special promotions that could be coordinated with Elder–Beerman's advertising schedule. These plans were approved by Mr. Scarangella on October 12, 1995.

19. Prior to the Chapter 11 petition, Thomasville had grown to represent 25% of Elder–Beerman's wood products business with projected annual sales in excess of $2.5 million. It has been estimated that termination of the Thomasville product line may result in lost sales of $ 750,000 in wood products and $400,000 in upholstery business.

20. On October 17, 1995, Elder–Beerman and certain of its subsidiaries filed voluntary petitions for protection under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), in this court.

21. Immediately upon the filing of Elder–Beerman's bankruptcy petition on October 17, 1995, the relationship between Elder–Beerman and Thomasville changed dramatically.

22. Thomasville notified Elder–Beerman that the customized promotional program designed specifically for Elder–

Beerman by Thomasville had terminated with the bankruptcy petition. Thomasville never offered Elder–Beerman another discount or promotional incentive until April 12, 1996, just one week prior to the hearing held on April 19, 1996.

23. On October 18, 1995, Thomasville demanded that Elder–Beerman return all previously shipped merchandise. On October 19, 1995, Thomasville stopped all shipments to Elder–Beerman. Thomasville did not resume shipments until Elder–Beerman furnished Thomasville with a $ 300,000 security, in early December.

24. On October 20, 1995, Charles Shaffer, Elder–Beerman's General Merchandising Manager, and Ron Bultema met with Thomasville representatives to discuss the bankruptcy filing. Thomasville had already, earlier in the day, taken steps to replace Elder–Beerman as they met with Larry Klaben of Morris Furniture, an Elder–Beerman competitor in Dayton.

25. At the October 20th meeting, Ron Berrier, Thomasville's Treasurer, expressed Thomasville's "extreme displeasure over the filing and emphatically indicated that (Thomasville) would not ship orders in the backlogue [sic]." In addition, Terry Funk, Thomasville's Credit Manager, asked how Elder–Beerman was able to file for bankruptcy given the fact that it had an $80 million net worth. Finally, Mr. Berrier, on behalf of Thomasville, expressly stated, "we [have] no intention of continuing to do business with [Elder–Beerman]."

26. Thomasville has offered Elder–Beerman little or no support since the bankruptcy petition. Mr. Nesbit, Thomasville's representative to Elder–Beerman, has stopped his once regular store visits. Thomasville invited the president of Morris Furniture to the Midwest Dealer's Meeting, sponsored by Thomasville, in Chicago, Illinois, yet failed to invite representatives from Elder–Beerman. In addition, Thomasville failed to offer Elder–Beerman any of its regular factory discounts until the week prior to a hearing on April 19, 1996.

27. On January 22, 1996, Thomasville sent notice to Elder–Beerman that Thomasville was severing the parties' longstanding relationship. In the notice Thomasville stated that it would "allow orders for a 60–day period to allow [Elder–Beerman] to balance inventory and process sold orders."

28. On March 14, 1996, before the expiration of the 60–day period, Elder–Beerman filed a Verified Complaint for Injunctive Relief. On the same day, Elder Beerman moved for a temporary restraining order and a preliminary injunction. This court issued its Temporary Restraining Order (the "Order") on that date.

29. On March 22, 1996, Elder–Beerman filed its First Amended Complaint which, in addition to seeking injunctive relief, requested damages for Thomasville's breach of contract, both express and implied.

30. Subsequent to a hearing on April 19, 1996, both parties have adjusted their pleadings to address issues of the automatic stay. The matter currently before the court is Thomasville's Motion to Annul the Automatic Stay and Permit Decision on Preliminary Injunction.

### CONCLUSIONS OF LAW

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) & 1334. This proceeding constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).

▮ The court has been asked to annul the automatic stay as it applies to Thomasville's attempted contract termination on January 22, 1996. The bankruptcy automatic stay under § 362(a) of the Bankruptcy Code has been in effect since the October 17, 1995, filing. Therefore, without obtaining relief from the stay Thomasville's termination in January is void and of no effect.

Relief from stay is governed by § 362(d) of the Bankruptcy Code. Section 362(d) of the Bankruptcy Code states as follows:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization. . . .

11 U.S.C. § 362(d) (1994).

■ Of the four enumerated types of relief in § 362(d), annulment is unique in that it asks the court to retroactively permit an action taken in violation of the stay. *Schewe v. Fairview Estates (In re Schewe)*, 94 B.R. 938, 951 (Bankr.W.D.Mich.1989) ("If the stay was annulled, it would be deemed void and never effective; such an action would result in a retroactive modification of the stay."). As such, courts have been hesitant to annul the stay, save for exceptional circumstances.

The Eleventh Circuit, in an opinion widely cited by the courts in this Circuit, has stated that "the important congressional policy behind the automatic stay demands that courts be especially hesitant to validate acts committed during the pendency of the stay." *Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.)*, 749 F.2d 670, 675 (11th Cir.1984) (footnote omitted); *see also Scrima v. John Devries Agency, Inc.*, 103 B.R. 128 (W.D.Mich.1989) ("[A]nnulment of an automatic stay is a radical form of relief."); *In re Schewe*, 94 B.R. at 951 ("Retroactive relief is only appropriate when a combination of factors justify the exercise of discretion to take such extraordinary action.").

■ Among the factors to be considered are the debtor's bad faith in filing the bankruptcy petition and the moving party's knowledge of the bankruptcy at the time of its action. In *Albany Partners*, the bankruptcy court found a lack of good faith on the part of the debtor, primarily because the debtor deliberately concealed important facts in the bankruptcy papers and because the economic reality of the situation led to the "conclusion that the debtor had no realistic chance of successfully reorganizing." *Albany Partners*, 749 F.2d at 674. In the case at bar, the reorganization plan is progressing and all indications are that an effective reorganization plan will be proposed within a reasonable time. The court finds no indication of bad faith on the part of Elder–Beerman.

■ Absent a finding of bad faith, courts may also grant retroactive relief if they find that the moving party had no knowledge of the bankruptcy at the time of its action, and the court finds that it would have granted relief before the act, had such relief been timely requested. *See Albany Partners*, 749 F.2d at 675 (citing 2 COLLIER'S BANKRUPTCY MANUAL ¶ 362.06 (3d ed. 1983)); *In re Boston Business Machs.*, 87 B.R. 867, 871 (Bankr. E.D.Pa.1988). In this case, not only was Thomasville aware of Elder–Beerman's bankruptcy petition, but was clearly motivated by the bankruptcy in its action. As such, the court finds no compelling reason to exercise the exceptional remedy of annulment.

■ In addition, although not expressly requested by Thomasville, the court has the power to *sua sponte* consider other forms of relief from the stay. *In re Laventhol & Horwath*, 139 B.R. 109, 116 n. 6 (S.D.N.Y. 1992) ("[I]f necessary, the Bankruptcy Court could *sua sponte* modify the automatic stay. . . ."); *Furness v. Lilienfield*, 35 B.R. 1006 (D.Md.1983) (modifying stay *sua sponte*); *Putnam County Sav. Bank v. Bagen (In re Bagen)*, 185 B.R. 691, 701 (Bankr. S.D.N.Y.1995) (modifying the stay *sua sponte*); *James v. Draper (In re James)*, 112 B.R. 687, 700 (Bankr.E.D.Pa.), *aff'd in part, vacated in part on other grounds*, 120 B.R. 802 (E.D.Pa.1990), *rev'd on other grounds*, 940 F.2d 46 (3d Cir.1991) ("The court is obliged to raise the issue of the application of the automatic stay *sua sponte*."); *In re Clark*, 69 B.R. 885, 890 n. 1 (Bankr.E.D.Pa. 1987) ("[W]e have a duty to raise obvious

defenses to, as well as the issue of, the impact of the stay *sua sponte*.").

■ Section 362(d)(1) allows the court to grant relief from the automatic stay "for cause, including the lack of adequate protection." The court finds that the there is no lack of adequate protection under the facts above. At Thomasville's request, Elder–Beerman provided Thomasville with a $300,000 deposit to assure payment of post-petition orders. This deposit comprises adequate protection for Thomasville's interests and contract rights.

■ Section 362(d)(2) authorizes relief from the stay if two conditions are met—the debtor does not have an equity in the property and the property is not necessary to an effective reorganization. 11 U.S.C. §§ 362(d)(2)(A) & (B). The facts show Elder–Beerman has developed equity in the contracts by the 35 year relationship by common advertising of Thomasville and the public's expectation that Elder–Beerman carry this furniture line.

More importantly, continuation of the contract is necessary to the reorganization of Elder–Beerman. Mr. Max Gutmann, CEO of Elder–Beerman, testified to the 35 year relationship between Elder–Beerman and Thomasville.

Thomasville has a fine name in the furniture industry and in furniture retailing. Furniture is essential to the department store because customers come to see the furniture line. If a customer buys furniture, the customer may buy lamps, bedding, mattresses, carpeting, or other appurtenances or accessories to the furniture. If the customer only looks at furniture, as he or she moves through the store some other merchandise may be attractive and result in a sale to him or her.

Thomasville has a complete line of furniture. To replace its line of furniture Elder–Beerman might require 6 to 9 additional furniture companies. Elder–Beerman sold $2,226,000 of Thomasville in 1995, nearly doubling its previous sales. Ron Bultema, Elder–Beerman's Divisional Merchandising Manager, testified that Thomasville has the "lion's share" of Elder–Beerman's furniture

business (40% or more of sales). Replacing Thomasville would cause multiple problems in scheduling, ordering, delivering and invoicing (up to nine times the amount of paperwork for as many as 9 additional companies, compared to dealing with Thomasville, one company). The additional cost would be excessive. Salespeople would need much training on the numerous new company lines. Advertising would be required to promote the new companies names and the relationship with Elder–Beerman. All of this effort would be done while Elder–Beerman is working to establish a plan of reorganization. Mr. Bultema estimated it would take as much as two years to establish customer recognition of the new furniture company names to put sales at the level they were with Thomasville.

It is therefore clear that the Thomasville line is necessary for Elder–Beerman's reorganization.

■ In addition, the prospect of an effective reorganization plan must be demonstrated. *United Sav. Assoc. of Texas v. Timbers of Inwood Forest Assoc., Ltd.,* 484 U.S. 365, 375–76, 108 S.Ct. 626, 632–33, 98 L.Ed.2d 740 (1988). In order to be effective, a "reorganization plan must be 'reasonably feasible.'" *Cook v. Society Bank (In re Cook),* 940 F.2d 659, 1991 WL 147458, * *1 (6th Cir.1991). As stated above, the court has found that the reorganization plan is progressing and all indications are that an effective reorganization plan will be proposed within a reasonable time.

■ Finally, the court acknowledges Thomasville's argument that the existence of an "at will" termination clause is sufficient cause to grant relief from the automatic stay, but finds this argument to be unfounded. The conditions under § 362(d) govern relief from the stay, and when those conditions are not met, courts have not hesitated to leave the stay intact, even in the presence of "at will" termination clauses. *Minoco Group of Cos., Ltd. v. First State Underwriters Agency of New England Reins. Corp. (In re Minoco Group of Cos., Ltd.),* 799 F.2d 517, 519 (9th Cir.1986) (staying the right to cancel insurance policy under § 362); *Pester Refining Co. v. Insurance Co. of North Am. (In re*

*Pester Refining Co.)*, 58 B.R. 189, 192 (Bankr.S.D.Iowa 1985); *In re B. Siegel Co.*, 51 B.R. 159, 163–64 (Bankr.E.D.Mich.1985); *In re Garnas (Garnas v. American Family Mut. Ins. Co.)*, 38 B.R. 221, 223–24 (Bankr. D.N.D.1984).

Thus, in addition to no compelling reason for granting the exceptional remedy of annulment, the court also finds that the requisite conditions for relief from stay have not been met. The court, therefore, will deny Thomasville's motion for relief from the automatic stay.