**In re NATIONAL HYDRO–VAC INDUSTRIAL SERVICES, L.L.C., Debtor.**

**No. 01–50466M.**

United States Bankruptcy Court, E.D. Arkansas, Pine Bluff Division.

May 24, 2001.

Brian Rosenthal, Kevin P. Keech, Little Rock, AR, for debtor.

Rosalind M. Mouser, Pine Bluff, AR, for Simmons First National Bank.

## MEMORANDUM OPINION

JAMES G. MIXON, Bankruptcy Judge.

The issue before the Court is whether to grant relief from the automatic stay to Simmons First National Bank ("Bank") to terminate its Bank Card Merchant Agreement ("Agreement") with National Hydro–Vac Industrial Services, L.L.C. ("Debtor"). After the Bank filed its motion for relief from stay on April 12, 2001, a hearing was conducted on the matter on April 24. The Court ruled from the bench that the Agreement is an executory contract and that the Bank's postpetition termination of the Agreement was a technical violation of the stay subject to annulment. The Court took under advisement the issue of whether to grant prospective relief from stay to the Bank.

The Court has jurisdiction pursuant to 11 U.S.C. § 1334 and § 157. This is a core proceeding in accordance with 28 U.S.C. § 157(G) (1994), and the Court may enter a final determination in this case.

## FACTS

The Debtor is an industrial cleaning contractor performing services such as vacuuming, hydro-blasting, and chemical cleaning at industrial sites throughout the United States. In April of 1999, prior to the Debtor's bankruptcy, the Debtor and the Bank entered into the Agreement at issue. Pursuant to the Agreement, the Debtor's customers can charge to their bank charge cards, such as Visa or MasterCard, amounts owed to the Debtor for services rendered to the customer.

Under the terms of the Agreement, the Debtor processes the customer's credit card number though a terminal supplied by the Bank, and when the charge is approved, the transaction is transmitted to the Bank. The Bank then processes the transaction through to the card-issuer bank, which in turn debits the customer-cardholder's account. Within 24 to 48 hours, the Bank credits the Debtor's account at the Bank with the amount charged and paid through a credit card by the Debtor's customer. The Bank later collects the same amount from the card-issuer bank. The Bank is paid a fee of 15 cents and 3% of each transaction for providing this service to the Debtor.

The Agreement provides that either party may terminate the Agreement "at any time, without cause and for any reason whatsoever, effective immediately upon notice of termination given to the other party hereto." (Simmons Ex. 4.) The terms of the Agreement also state that it is not transferrable or assignable.

The Bank is not liable for the customers' unpaid charges, but is responsible for reimbursing the card-issuer bank for chargebacks. In general, chargebacks occur whenever the customer prevails in disputing a charge to his credit card. The Bank has recourse against the Debtor for any chargebacks it pays and can debit the Debtor's account for any such chargeback, provided the Debtor's account has sufficient funds to cover the amount of the chargeback. Otherwise, the Bank holds the debt outstanding.

During the course of the two-year relationship between the parties, no chargebacks have occurred. However, the Bank stated that because each transaction between the Debtor and its customer is a "card not present" transaction, there is no time limit as to when a chargeback may be asserted by the customer. In relation to the chargebacks, the Agreement gives the Bank a security interest in the Debtor's accounts and any reserves. The Bank has not requested the Debtor to establish a reserve, nor has it asked for collateral to secure its position with regard to potential chargebacks. Since the bankruptcy filing, the Debtor does not have any unencumbered property or accounts to offer as collateral to secure the Agreement.

The Debtor benefits from the Agreement because it may immediately collect funds due from its customers and eliminate collection expense. Additionally, a few of the Debtor's customers prefer to use credit cards as an expedient bookkeeping method for paying for smaller jobs.

In the last twelve months, the Debtor's customers have charged 241 transactions totaling $125,822.19 under the credit card arrangement with the Bank. The Debtor's annual gross sales are approximately $9.9 million.

Michelle Richard, the Debtor's employee, testified that the Debtor was in danger of losing at least one significant account if it no longer offered the potential to charge on credit cards. Richard also testified that since the Debtor's competitors did not offer a similar service, the Agreement serves as a means for attracting new accounts.

On March 15, 2001, the Debtor filed for relief under the provisions of chapter 11 of title 11 of the United States Code. According to employees of the Bank who testified at the hearing, the Bank became aware of the bankruptcy filing shortly thereafter, and the Bank exercised its right to terminate as stated in the Agreement before the Debtor assumed or rejected the Agreement. A termination letter was written to the Debtor at some time between March 27 and April 5 in which the Bank offered no explanation for the termination. A Bank employee subsequently explained to the Debtor's president that the termination was due to concern over the Debtor's financial condition. Since the termination, the Debtor has been unable to enter into a new bank card merchant agreement under the same terms with any other bank or entity offering such a service.

On April 12, 2001, the Bank filed a motion for relief from stay and for abandonment so that the Bank could exercise its right under the Agreement to terminate. The Debtor filed a response and after a hearing, the Court took the matter under advisement.

## DISCUSSION

The parties agree, and the Court has so ruled, that the Agreement is an executory contract governed by the provisions of 11 U.S.C. § 365. Furthermore, the Bank concedes that the Agreement is not a contract to make a loan or extend other debt financing or financial accommodations to the Debtor.

Therefore, the prohibitions against assumption and termination of those types of credit and loan contracts are not applicable to the instant case. *See* 11 U.S.C. § 365(c)(2) (1994) (trustee may not assume or assign executory contract to make loan or extend financial accommodations); 11 U.S.C. § 365(e)(2)(B) (1994) (statutory prohibition against termination of executory contract because of financial condition of the debtor is not applicable in executory contacts to make loan or extend financial accommodations). *See, also, Citizens & Southern Nat'l Bank v. Thomas B. Hamilton Co. (In re Thomas B. Hamilton Co.)*, 969 F.2d 1013, 1021 (11th Cir.1992) (ruling that Bankruptcy Code exception from executory contract treatment for contracts to make loans or financial accommodations does not apply to credit card merchant agreements).

The Bank argues that it should be granted relief from stay to terminate the Agreement pursuant to section 365(e)(1) and (2)(A)(i)– (ii) of the Bankruptcy Code. That section provides:

(e)(1) Notwithstanding a provision in an executory contract ... an executory contract ... of the debtor may not be terminated ... at any time after the commencement of the case ...

(2) Paragraph (1) of this subsection does not apply to an executory contract ... of the debtor ... if

(A)(i) applicable law excuses a party, other than the debtor, to such contract ... from accepting performance from or rendering performance to the trustee or to an assignee of such contract ... whether or not such contract ... prohibits or restricts assignment of rights or delegation of duties; and

(ii) such party does not consent to such assumption or assignment ...

Pursuant to this statute, the Bank argues that it can terminate the contract because applicable law excuses the Bank from performing. In support of this argument, the Bank asserts that the Agreement is a service contract obligating the

Bank to provide the availability of merchant credit card processing to the Debtor. The Bank contends that the Agreement establishes a bank/depositor relationship between the Bank and the Debtor and that the Agreement is, therefore, personal to the Debtor.

The Bank's reasoning is that because the Agreement is a personal services contract, the Debtor or Debtor-in-possession cannot assume the Agreement. The Bank states that assumption of the contract is expressly prohibited by Paragraph 24 of the Agreement, which forbids transfer or assignment of the Agreement, and that the nonassignment clause further supports the Bank's personal services contract argument.

The Bank further asserts that the contract, under its terms, is terminable at will by the Bank. Thus, assumption of the Agreement by the Debtor would be futile because the Bank will immediately terminate upon assumption.

In support of its position, the Bank cites three cases; however, each is distinguishable from the instant case. *In re West Electronics, Inc.*, 852 F.2d 79 (3d cir.1988) presented the question of whether relief from stay should be granted so that the United States Air Force could terminate its contract with the debtor. The court held that the section 365 prohibition against termination of an executory contract was not applicable because nonbankruptcy federal law prohibited the debtor's assignment of the contract without the government's consent; therefore, relief from stay was granted. However, in the instant case, nonbankruptcy federal law is not implicated.

In *Tonry v. Hebert (In re Tonry)*, 724 F.2d 467 (5th Cir.1984), the court refused to allow the chapter 7 trustee to assume the oral contingent fee contracts between a debtor attorney and several clients. Louisiana law endowed the debtor's clients with a right to decline performance by the trustee of the debtor attorney's executory contingent fee contracts because they were personal service contracts. *In re Ewing*, 147 B.R. 970 (Bankr.D.N.M.1992) is a similar case in that the court found the executory contract at issue was for personal services and, therefore, nonassumable without consent.

■ In general, Arkansas law does not allow assignment, without consent, of personal services contracts such as those in *In re Tonry* and *In re Ewing*. If the Bank is correct that the Agreement is a personal services contract, then the Bank may terminate the Agreement pursuant to section 365(e)(2)(A)(i)–(ii) because performance is excused under state law.

■ Under Arkansas law, a personal services contract contains obligations involving "such a relation of personal confidence" that the parties intend performance solely by the party obligated. *Leader Co. v. Little Rock Ry. & Elec. Co.*, 120 Ark. 221, 179 S.W. 358 (1915) (holding that contract to supply electricity was not personal services contract). In a personal services contract the personality of one of the parties is material. *Redman v. Mena Gen. Hospital*, 202 Ark. 755, 152 S.W.2d 542 (1941) (quoting 17 C.J.S., Contracts, § 10). No party can perform except the party named in the contract, unless the parties agree otherwise. *Redman*, 152 S.W.2d at 544 (quoting *Deaton v. Lawson*, 40 Wash. 486, 82 P. 879, 880). Personal services are not those that "may be as well performed by others as by the individual with whom the contract was made." *Carlock v. LaSalle Extension University*, 185 F.2d 594, 595 (7th Cir.1950) (citations omitted).

In the instant case, despite the Bank's assertion, the nature of the relationship between these two business entities, the

Debtor and the Bank, is commercial and not based on the provision of personal services rendered by the Bank. There is no specific individual with whom the Debtor contracted to supply the service to be performed by the Bank. Moreover, the Bank's service is not unique in that it is offered by other entities, albeit for higher rates than that charged by the Bank. The Bank's obligations under the Agreement may be as well performed by other entities in the business of supplying merchant card services.

■ The Bank also attempts to support its personal services argument by emphasizing that the parties agreed that the rights and obligations in the Agreement were neither transferrable nor assignable. However, the Bank cites no case where the court found a personal services contract existed based on the fact that the contract contained a nonassignment clause. To the contrary, see, *Leader Co. v. Little Rock Ry. & Electric Co.*, 120 Ark. 221, 179 S.W. 358, 359 (1915) (holding that contract with nonassignment clause was not a personal services contract).

Moreover, under bankruptcy law a nonassignment clause is ineffective to block assumption because the Code provides that a trustee may assume or reject "any executory contract." 11 U.S.C. § 365(a) (1994). The exceptions to a trustee's ability to assume or reject are not based on the existence of a nonassignment clause. *See, e.g.*, 11 U.S.C. § 365(c) (1994) (trustee may not assume or assign executory contract where performance is excused by applicable law or where agreement is financial accommodation, regardless of existence or absence of nonassignment clause in the contract).

■ The Bank's final argument is that if the contract is assumed, its terminable-at-will clause allows the Bank to immediately terminate the Agreement. Thus, to deny

relief from stay is futile. However, caselaw considering executory contracts with termination clauses supports the Debtor's position that to enforce the clause in this case would violate the Congressional policy undergirding 11 U.S.C. § 365(e)(1) (1994). That section "expressly invalidates *ipso facto* and other bankruptcy termination clauses" predicated on the financial condition of the debtor, the debtor's bankruptcy filing, or the appointment of a trustee in bankruptcy. 3 Collier on Bankruptcy ¶ 365.07 (Lawrence P. King et al. eds, 15th ed. rev.2000).

In *In re B. Siegel Co.*, 51 B.R. 159 (Bankr.E.D.Mich.1985), the court discusses at length the Bankruptcy Code's treatment of executory contracts in relation to termination clauses. In that case, the court ruled that an insurer was not free to cancel the debtor's insurance policy, terminable-at-will, because of the debtor's involuntary bankruptcy. The Court found that the cancellation "contravened an expressed congressional policy" as stated in section 365(e)(1). *In re B. Siegel Co.*, 51 B.R. at 163.

In the common law context, the court reasoned that terminable-at-will provisions do not confer "an unrestricted right to cancel" a contract that is commercial rather than personal in nature. *In re B. Siegel Co.*, 51 B.R. at 164 (citations omitted). In a commercial contractual relationship, terminable-at-will provisions must be exercised in good faith. *In re B. Siegel Co.*, 51 B.R. at 164 (citing *United Roasters, Inc. v. Colgate–Palmolive Co.*, 649 F.2d 985, 988–989 (4th Cir.1981); *J.R. Watkins Co. v. Rich*, 254 Mich. 82, 84, 235 N.W. 845 (1931); Restatement (Second) of Contracts § 205 cmt. e (1979 & Supp.1984)).

Like the contract in *In re B. Siegal Co.*, the Agreement in the instant case has a terminable-at-will clause which the Bank

cites as a reason to grant relief from stay. As a Bank employee testified, under the terminable at will provision, the Bank cancelled the Agreement when it learned of the Debtor's bankruptcy. Under the rule in *In re B. Siegal*, the Bank may not exercise its right to terminate for this reason because it contravenes the legislative purposes of the very statute the Bank employs to argue for relief from stay. Moreover, the Debtor was not in default and had no history of chargebacks when the Bank terminated the Agreement. Under those circumstances, cancelling the contract upon the Debtor's filing of a bankruptcy petition at least raises the inference of bad faith on the part of the Bank.

This conclusion comports with that of several bankruptcy courts that have denied relief from stay to a party wishing to terminate a contract under an at-will termination clause. *See In re Elder–Beerman Stores Corp.*, 195 B.R. 1012, 1018–19 (Bankr.S.D.Ohio 1996) (holding terminable-at-will provision was not sufficient reason to grant relief from stay to party wishing to terminate the contract) (citing *Minoco Group of Cos., Ltd. v. First State Underwriters Agency of New England Reins. Corp. (In re Minoco Group of Cos., Ltd.),* 799 F.2d 517, 519 (9th Cir.1986); *Pester Refining Co. v. Ins. Co. of North Am. (In re Pester Refining Co.),* 58 B.R. 189, 192 (Bankr.S.D.Iowa 1985); *In re B. Siegel Co.,* 51 B.R. 159, 163–64 (Bankr. E.D.Mich.1985); *Garnas v. Am. Family Mut. Ins. Co. (In re Garnas),* 38 B.R. 221, 223–24 (Bankr.D.N.D.1984)). *See, also, Citizens & Southern Nat'l Bank v. Thomas B. Hamilton Co. (In re Thomas B. Hamilton),* 115 B.R. 384, 387 (Bankr. N.D.Ga.1990) (holding bank could not terminate contract for merchant card services despite termination clause). *But, see, Valley Forge Plaza Assoc. v. Schwartz,* 114 B.R. 60, 63 (E.D.Pa.1990) (ruling postpetition termination of convention center booking agreement as provided by contract did not violate the automatic stay).

In addition to the causes to lift stay argued in its brief and addressed by the Court above, the Bank has also asserted in its motion to lift stay that it is entitled to relief for the following reasons enumerated in the Bankruptcy Code:

> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
>
> (2) with respect to a stay of an act against property under subsection (a) of this section if—
>
>> (A) the debtor does not have an equity in such property; and
>>
>> (B) such property is not necessary to an effective reorganization ...

11 U.S.C. § 362(d)(1) & (2) (1994).

■ The Bank states that it is not adequately protected, the Debtor has no equity in the Agreement, and the Agreement is not necessary to an effective reorganization of the Debtor. As to adequate protection, the Court notes that while the Bank is at some risk for chargebacks, the Bank has a security interest in reserves and accounts of the Debtor, at least one way that the Bank is protected under the Agreement itself. It is also important to note that throughout the parties' two-year relationship, no chargebacks have been asserted by the Debtor's customers. Furthermore, there is no evidence that the Debtor has ever committed fraud or been in default with respect to the Agreement. Therefore, the Court finds that the Agreement's terms and the provisions of section 365 adequately protect the Bank's interest. *See, Citizens & So. Nat'l Bank v. Thomas B. Hamilton., Inc., (In re Thomas B. Hamilton Co.),* 969 F.2d 1013, 1021 (11th Cir.1992) (holding merchant bank, while at risk for chargebacks, is adequately protected by section 365 against assumption

of unreasonable risk such as high percentage of chargebacks, debtor's fraud, or default without cure).

■ Furthermore, the evidence presented at the hearing clearly demonstrated that the Debtor is in need of a bank card merchant agreement for effective reorganization. Based on figures from the previous twelve months, if the Debtor has no such agreement in place, it stands to lose $125,822 or more in revenue during the coming year. The Debtor has been unable to replace the Agreement with another contract with the same favorable terms. Although the amount of credit card sales is not a substantial portion of the Debtor's gross sales, the lack of merchant card privileges could mean the loss of a significant customer and the ability to attract new business.

Because the Debtor demonstrated a need for the Agreement in order to reorganize, there is no reason to address the issue of whether the Debtor has equity in the property. This is so because both (A) and (B) of section 362(d)(2) must be proven before relief can be granted under section 362(d)(2), and the Bank did not establish that the Agreement was unnecessary for effective reorganization.

## CONCLUSION

The Bank's postpetition termination of the Agreement violated the automatic stay and is therefore void. The Bank's motion for relief from stay and for abandonment in order to terminate the Agreement is denied.

IT IS SO ORDERED.