Ms. Teresa Marks, Director Arkansas Department of Environmental Quality
5301 Northshore Drive North Little Rock, Arkansas 72118-5317
Dear Ms. Marks:
I am writing in response to your request for an opinion on several questions relating to the waste tire program created underAct 749 of 1991, codified as amended at A.C.A. §§ 8-9-401 to-405 (Repl. 2000, Supp. 2009) ("Act 749").
Your request contains substantial information about relevant law, which I paraphrase as follows:
The State is divided into regional solid waste management districts (each, a "district") which are governed by regional solid waste management boards (each, a "board"). See generally
A.C.A. §§ 8-6-701 to-724 (Repl. 2000, Supp. 2009). The solid waste management plan of each board must include "a plan to dispose of or recycle waste tires within the district." A.C.A. § 8-6-717(c) (Repl. 2000). Each board must establish a waste tire collection center for the use of residents of the district. See
A.C.A. § 8-6-718 (Repl. 2000).
As directed by Act 749, the Arkansas Department of Environmental Quality (the "Department") has established a program to make waste tire grants to boards desiring to receive grants, and the Arkansas Pollution Control and Ecology Commission (the "Commission") has adopted regulations that, among other things, set forth responsibilities of the districts and the boards with respect to waste tires and procedures for administering the waste tire grant program and issuing grants.See A.C.A. §§ 8-9-405(a),-403(d) (Supp. 2009); APC EC Regulation 14 (2006). *Page 2 
Regulation 14 provides that a waste tire grant may be subject to specified conditions, including at a minimum that a district receiving funds "must conform to all applicable procurement laws on contracting for services. . . ." Reg. 14.505(c)(1). A district receiving a grant may "award only the per tire or per ton amounts needed to cover the cost of the winning bid on a contract for services. Funding received by a [d]istrict that is over and above the cost of the winning bid shall be carried in reserve and utilized for other eligible projects. . . ." Reg. 14.505(D).
Under Act 749, "[t]o be eligible to receive waste tire management grant funds, [a board] shall provide the [D]epartment with quarterly financial and progress reports, as determined by the [D]epartment." A.C.A. § 8-9-405(c)(2). Regulation 14 requires each district to report quarterly to the Department the amount of grant funds held in reserve by the district, and disqualifies a district holding "an overage of funds in reserve" from receiving additional grant funds until the reserves have been expended or obligated. See Reg. 14.501(C)(3), (4).
Regulation 14 authorizes a waste tire collection center to collect an equitable fee for the acceptance of non-fee paid tires, i.e., tires with respect to which no state waste tire fee has been paid on a replacement tire. See Reg. 14-1004(D). The district must report quarterly to the Department the total of such fees collected. Seeid.
Your request also contains substantial factual information about one district's practices in connection with waste tires. The paragraphs below paraphrase the relevant information set forth in your request. Material within quotation marks, other than defined terms, comes from your request.
The district at issue is known as the White River Regional Solid Waste Management District (the "White River District"), and is governed by the White River Regional Solid Waste Management District Board (the "White River Board").
The White River Board "created the White River Regional Management Corporation in 1993 for the stated purpose of providing waste tire program services and for insulating the individual members of the [White River Board] from legal actions and monetary judgments." The White River Regional Management Corporation (the "White River Corporation") "provides administrative services to the [White River District] under contract `at a rate of *Page 3 
$60.00 per ton for passenger and truck waste tires but not to exceed 90 percent of the funds received by the [White River Board] through the Arkansas Waste Tire Program.'"[1] The White River Corporation shares the White River Board's physical and mailing address and "is managed by the same individuals [who] work for the [White River Board]."
The White River Board "is not reporting funds held by the [White River Corporation] on the quarterly reporting forms as required by [the Department]." The Agreement "requires the [White River Corporation] to disclose costs and obligations it incurs to the [White River Board], but prohibits the disclosure of this information to others without written approval by the [White River Board]."
The White River Board has a permit to operate a waste tire monofill. The White River Board "leases the [monofill] property and pays the utilities and certain other miscellaneous expenses", and the White River Corporation provides "[t]ire collection, transportation, and labor. . . ." The White River Corporation "is paid by the [White River] Board for providing these services."
Your questions are:
 1. Must a [board] solicit bids under state or county procurement laws if it chooses to secure a contract for services to manage waste tires and establish waste tire collection centers?
 2. Is it permissible for a [board] to create a corporation and award a contract to that corporation to process waste tires and establish waste tire collection centers?
 3. Is the [White River Corporation] required to report how the funds it receives through the waste tire program have been expended on waste tire projects, the amount of waste tire funds it holds in reserve and any other information required by [the Department] so that [the Department] can trace how the grant monies given to [the White River Board] are used? *Page 4 
 4. Is it permissible for the [White River Corporation] to collect and retain disposal fees for non-fee tires and other [boards'] tires that are disposed or processed at [the White River Board's waste tire monofill site], including tires that are accepted "at the door" rather than being collected and transported from other locations?
 5. If [the answer to question 4 is "yes"], should the [White River Corporation] pay a tipping fee to the [White River Board]?
 6. [M]ust any [non-fee paid tire] fees collected by the [White River Corporation] be reported to [the Department]?
 7. [M]ay [the Department] deny awarding waste tire grant monies to the [White River Board] if the [White River Corporation] has an overage of waste tire funds in reserve?
RESPONSE
In my opinion, with respect to your first question, a regional solid waste management board must solicit bids under county procurement laws for a waste tire services contract. With respect to your second question, it is my opinion that a board has no authority unilaterally to create a corporation to perform a waste tire services contract. I respectfully decline to answer the remainder of your questions, for the reasons set forth below, following the restatement of such questions.
Question 1: Must a [board] solicit bids under state or countyprocurement laws if it chooses to secure a contract for services tomanage waste tires and establish waste tire collection centers?
In my opinion, a regional solid waste management board must solicit bids under county procurement laws if it chooses to contract in an amount anticipated to be at least $20,000 for services to manage waste tires and establish waste tire collection centers.
Arkansas law provides that "[t]he regional solid waste management boards shall adopt and follow county purchasing procedures, as provided in [A.C.A.] § 14-22-101 et seq., as the approved purchasing procedures for the districts." A.C.A. § 8-6-704(c) (Supp. 2009). *Page 5 
The county purchasing procedures referred to above require "[f]ormal bidding" for "[a]ll purchases of commodities" where "the estimated purchase price shall equal or exceed twenty thousand dollars ($20,000). . . ." A.C.A. § 14-22-104 (Supp. 2009). The word "commodities" is defined to include "services other than personal services. . . ." A.C.A. § 14-22-101(1) (Supp. 2009).
The question arises, then, whether "services to manage waste tires and establish waste tire collection centers," to use the words of your request, are "personal services," the purchase of which is not subject to county bidding requirements, or "commodities," which, subject to the monetary threshold, must be purchased through a bidding process.
Reference to several authorities indicates that such services should be deemed to be commodities and thus subject the county bidding requirement.
The county purchasing statute does not define the term "personal services." There are no Arkansas cases interpreting the term as used in A.C.A. § 14-22-101(1) or the same or a similar term as used in other statutes regulating public purchasing. The Supreme Court of Arkansas has, however, discussed the meaning of the term "personal services contract" in several cases.
In The Leader Co. v. Little Rock Ry. Elec. Co.,120 Ark. 221, 179 S.W. 358 (1915), the court discussed the rule that contracts for personal services are not generally subject to assignment and held that "a personal services contract contains obligations involving `such a relation of personal confidence' that the parties intend performance solely by the party obligated." In reNational Hydro-Vac Indus. Serv., L.L.C,262 B.R. 781, 785 (E.D. Ark. 2001), quoting The Leader Co.,120 Ark. at 225.
In Redman v. Mena Gen. Hosp.,202 Ark. 755, 152 S.W.2d 542 (1941), the court considered a contract under which two physicians agreed to operate a hospital. The court held the agreement to be a joint undertaking of the physicians that required the personal services of each, such that a breach of the contract by either physician constituted the breach of both, neither alone being able to perform adequately the services required under the contract. The court characterized the contract as one that "contemplated the personal services of each of these skilled and experienced physicians and as such their personality becomes very material. . . ." Id. at 759. The court quoted with approval from a general source: "A *Page 6 
personal contract is a contract for personal services; a contract in which the personality of one of the parties is material."Id. at 759, quoting 17 C.J.S. 330, § 10.
In Olen Spann Estate v. Kennedy Son,257 Ark. 857, 520 S.W.2d 286 (1975), the court held that a contract to grow and sell cotton was not a personal services contract, and thus was not terminated by the farmer's death, even though the skill and reputation of the farmer, the quality of the lands upon which the crop would be grown, and the farmer's access to appropriate seed, supplies, equipment, and financing are all factors of great importance to the counterparty.
The court in National Hydro-Vac, applying Arkansas law, held that a bank card merchant agreement was not a non-assignable contract for personal services, stating that "[p]ersonal services are not those that `may be as well performed by others as by the individual with whom the contract was made.'" National Hydro-Vac,262 B.R. at 785, quoting Carlock v. LaSalle Extension University,185 F.2d 594, 595 (7th Cir. 1950).
In my view, contracts for personal services are not subject to competitive bidding under Arkansas county procurement laws[2] for the same reasons that such contracts terminate at death and are not assignable, as discussed in the cases cited. The reasons, in my estimation, essentially amount to the fact that the individual qualities of the contractor are so important to the arrangement that the substitution of another contractor, even one with similar skills, likely would frustrate the purpose.
While Arkansas appellate courts have not addressed the meaning of the term "personal services" in the public purchasing context, this Office has done so on several occasions.
 Although the term "personal services" is not defined in the statute, the Attorney General has consistently adhered to the view, based upon generally recognized authority, that "personal services" are those services *Page 7 
that require special skill, experience, or business judgment. See, e.g., Ops. Att'y Gen. Nos. 1994-286; 93-412; 91-308; 90-037; 90-030.
Op. Att'y Gen. 2007-015, quoting Op. Att'y Gen. 99-136.
A predecessor in this office wrote:
 Normally, the term [i.e., "personal services"] refers to services that are to be provided by a specific person. See, e.g., Interstate Freeway Service v. Houser, 310 Ark. 302, 835 S.W.2d 872 (1992).
Op. Att'y Gen. 2004-129.
Twice, this Office has opined that solid waste management services do not constitute personal services. See Op. Att'y Gen. 2007-015, 96-283.
All of the foregoing is consistent with the definition of "personal service" appearing in a standard legal reference:
 An act done personally by an individual. In this sense, a personal service is an economic service involving either the intellectual or manual personal effort of an individual, as opposed to the salable product of the person's skill.
Black's Law Dictionary 1259-1260 (9th ed. 2009).
In the introductory portion of this opinion, I quoted from provisions of Regulation 14 that expressly require districts receiving grant funds to follow applicable purchasing laws and implicitly require competitive bidding with respect to contracts for waste tire services. Those provisions amount to valid administrative interpretations of the governing law and, as such, they are entitled to deference unless "clearly wrong." Yamaha Motor Corp. v. Richard's Honda Yamaha,344 Ark. 44, 52, 38 S.W.3d 356 (2001).
My consideration of the foregoing authorities leads me to the conclusion that "services to manage waste tires and establish waste tire collection centers" are not "personal services" under A.C.A. § 14-22-101(1). As stated above, it is therefore my opinion that a regional solid waste management board must solicit bids under *Page 8 
county[3] procurement laws if it chooses to contract for services in an amount anticipated to be $20,000 or more to manage waste tires and establish waste tire collection centers.[4]
Question 2: Is it permissible for a [board] to create acorporation and award a contract to that corporation to process wastetires and establish waste tire collection centers?
In accordance with my answer to your first question, it is my opinion that a regional solid waste management board may not award a contract in an amount anticipated to be $20,000 or more "to process waste tires and establish waste tire collection centers" (i.e., a non-personal services contract) without soliciting bids under county procurement laws, regardless of whether the board created the corporation that is awarded the contract.
To the extent your question concerns the power of a board unilaterally to create a corporation for the purpose of contracting with the board for waste tire services, it is my opinion that a board has no such power. *Page 9 
The powers and duties of regional solid waste management boards are set forth primarily in A.C.A. § 8-6-704 (Supp. 2009). Nothing in that section expressly gives a board authority to create a corporation. The provision does, however, authorize a board "[t]o carry out all other powers and duties conferred by this subchapter and [A.C.A.] § 8-6-801 et seq. . . ." A.C.A. § 8-6-704(a)(12).
One power conferred by subchapter 7, chapter 6, title 8 of the Arkansas Code is the power of a board to "enter into agreements for the specific purpose of implementing" such subchapter. A.C.A. 8-6-709(a) (Repl. 2000). The section provides that any such agreement shall specify, among other things, "[t]he precise organization, composition, and nature of any separate legal or administrative entity created thereby, together with the powers delegated thereto, provided such entity may be legally created" and "[t]he manner of financing the joint or cooperative undertaking and of establishing and maintaining a budget therefor, provided that such legal entity may incur indebtedness. . . ." A.C.A. 8-6-709(b)(2), (4).
Clearly, A.C.A. § 8-6-709 authorizes a board to enter into an agreement in connection with which a "separate legal or administrative entity" is created. In my opinion, however, the limits of the authority granted by the statute are far from clear. It might be argued, for instance, that the statute, fundamentally authorizing only the entry into agreements, authorizes the creation only of those sorts of entities, such as partnerships and joint ventures, which may be created by contract. Regardless of the ultimate contours of the entity-creation authority granted by the statute, my opinion is that such authority is, at the very least, limited by a requirement that any such entity must be created in connection with an agreement entered into for the purpose of implementing subchapter 7. It is my opinion, in other words, that the statute does not authorize a board to create a corporation unilaterally, in the absence of a "joint or cooperative undertaking" with another preexisting entity.
There being no statutory authority for a board unilaterally to create a corporation, it is my opinion that a board has no such authority.See generally Ops. Att'y Gen. 2007-319, 97-092 (expressing opinion that boards lack authority to take action where no affirmative statutory authority for such action is present).
Question 3: Is the [White River Corporation] required to reporthow the funds it receives through the waste tire program have beenexpended on waste tire projects, the amount of waste tire funds it holdsin reserve and any other *Page 10 information required by [the Department] so that [the Department]can trace how the grant monies given to [the White River Board] areused?
Question 4: Is it permissible for the [White River Corporation] tocollect and retain disposal fees for non-fee tires and other [boards']tires that are disposed or processed at [the White River Board's wastetire monofill site], including tires that are accepted "at the door"rather than being collected and transported from other locations?
Question 5: If [the answer to question 4 is "yes"], should the[White River Corporation] pay a tipping fee to the [White RiverBoard]?
Question 6: [M]ust any [non-fee paid tire] fees collected by the[White River Corporation] be reported to [the Department]?
Question 7: [M]ay [the Department] deny awarding wastetire grant monies to the [White River Board] if the [White RiverCorporation] has an overage of waste tire funds in reserve?
I respectfully decline to answer these questions. The answers likely depend upon the totality of the unique facts and circumstances surrounding the actions of these particular parties. It is clear that I am not in possession of all the relevant facts. One assertion of fact contained in your request for an opinion is disputed by attorneys for a person interested in the content of my opinion, which attorneys made an unsolicited written submission of assertions of fact and arguments of law. This Office has a policy of long standing to the effect that it will not make factual determinations in the context of rendering opinions, as it is not equipped to investigate and evaluate questions of fact.
The facts in my possession suggest, as discussed above, that the White River Board may have created the White River Corporation without clear authority to do so and may have awarded the White River Corporation the waste tire services contract at issue without obtaining required competitive bids. I neither opine nor assert that either suggestion is true. If one or both of such suggestions are true in fact, however, a court considering these questions might well reach different conclusions than would a court considering the same questions in the context of a waste tire services contract let by competitive bidding to a contractor unrelated to the contracting board. *Page 11 
I decline to answer these questions as applied to the White River Board and the White River Corporation because I am not in possession of sufficient facts to determine the parties' compliance with applicable law and therefore to determine the appropriate answers to your questions. I decline to answer the questions as applied in general, in the context of a waste tire services contract let by competitive bidding to a contractor unrelated to the contracting board, because such answers might be misinterpreted to apply in particular to the parties involved here.
Assistant Attorney General J. M. Barker prepared the foregoing opinion, which I hereby approve.
Sincerely,
DUSTIN McDANIEL Attorney General
[1] You enclosed with your request a copy of an "Agreement for Services" dated July 1, 2009 (the "Agreement"), between the White River Board and the White River Corporation. The Agreement contains substantially the language quoted above pertaining to amounts to be paid to the White River Corporation thereunder.
[2] An exception to a bidding requirement for contracts for personal services is not unique to Arkansas county purchasing laws.See, e.g., A.C.A. § 6-21-301(1) (Repl. 2007) (defining "commodities," for purposes of school district purchasing requirements, to exclude "personal and professional services"); 73A C.J.S.Public Contracts § 15 (2004) ("Under particular statutes, the procurement of personal services . . . are not included within competitive bidding requirements . . . because those services are not subject to uniform specifications." (Citations omitted.)).
[3] As noted in your request, this Office has opined on several occasions that regional solid waste management boards are subject tostate procurement laws. Two of the opinions were rendered prior to the 1995 enactment of A.C.A. § 8-6-704(c), which expressly makes the boards subject to county procurement laws. See Ops. Att'y Gen. 91-442, 91-444. Others were rendered after 1995 but did not cite or otherwise refer to A.C.A. § 8-6-704(c). See Ops. Att'y Gen. 96-283, 99-021, 2002-180. In 2007, I questioned the accuracy of one of the post-1995 opinions and stated that a district must followcounty purchasing procedures. See Op. Att'y Gen. 2007-015. I reaffirm the 2007 opinion here: pursuant to A.C.A. § 8-6-704(c), a board must adopt and follow county purchasing procedures.
[4] Act 752 of 1991 authorizes boards to issue bonds to provide financing to accomplish solid waste projects. See generally
A.C.A. §§ 8-6-801 to-814 (Repl. 2000). One section states in relevant part:
 [T]he . . . operation and maintenance of projects under the provisions of [Act 752] need not comply with the requirements of any other law applicable to the . . . operation and maintenance of public works or facilities, including, without limitation, laws pertaining to public bidding . . . none of which laws shall be applicable to projects under [Act 752].
A.C.A. § 8-6-802(b).
The opinion stated herein in response to your first question is therefore given on the assumption that the contract in question is not entered into in connection with a facility or project financed under Act 752, and the opinion stated herein is limited to that assumed fact pattern. Nothing in this footnote should be understood as taking any position regarding the breadth of application of A.C.A. § 8-6-802(b). *Page 1